598 F.2d 1
 194 U.S.App.D.C. 82, 11 Fed. R. Evid. Serv. 1381,
4 Fed. R. Evid. Serv. 593
 Adele HALKIN et al., Appellants,
v.
Richard HELMS, Department of State, et al.
Adele HALKIN et al.
v.
Richard HELMS, Department of State, et al.,
Harold Brown, Secretary, Department of Defense in his
official capacity, Appellant.
 Nos. 77-1922, 77-1923.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued May 2, 1978.
Decided June 16, 1978.
As Amended Dec. 5, 1978.
Rehearing En Banc Denied Jan. 16, 1979.
 
 Appeals from the United States District Court for the District of Columbia (D.C.Civil 75-1773).
 Mark H. Lynch, Washington, D. C., with whom, John H. F. Shattuck, Washington, D. C., was on the brief for the appellants in case No. 77-1922, and cross appellees in case No. 77-1923.
 Daniel B. Silver, Washington, D. C., Gen. Counsel, National Security Agency, argued for the appellees in case No. 77-1922 and the cross appellant in case No. 77-1923.
 Barbara Allen Babcock, Asst. Atty. Gen., Earl J. Silbert, U. S. Atty., Deanne C. Siemer, Gen. Counsel, Dept. of Defense and Roy Banner, Gen. Counsel, National Security Agency, Robert E. Kopp, David J. Anderson, Larry L. Gregg and R. John Seibert, Attys., Dept. of Justice, Washington, D. C., were on the brief for appellees.
 Charles R. Donnenfeld, Rodney F. Page and Cameron M. Blake, Washington, D. C., also entered appearances for appellee Helms.
 H. Richard Schumacher, Miles M. Tepper, Taylor R. Briggs and Alvin K. Hellerstein, New York City, were on the brief for defendants appellees RCA Global Communications, Inc., ITT World Communications, Inc., and Western Union International, Inc.
 Milton Eisenberg, John T. Boese and Catherine R. Mack, Washington, D. C., were on the brief for amicus curiae Cord Meyer, Jr., urging affirmances insofar as the District Court properly dismissed those portions of the case which infringed upon and required publication of national security secrets.
 Before ROBB and WILKEY, Circuit Judges, and RONALD N. DAVIES,* U.S. Senior District Judge for the District of North Dakota.
 Opinion for the Court filed by ROBB, Circuit Judge.
 ROBB, Circuit Judge:
 
 
 1
 These cross-appeals concern the state secrets privilege and its effect upon a lawsuit filed by the plaintiffs, 27 individuals and organizations formerly active in opposing participation by the United States in the war in Vietnam. The defendants are present and former officials of the National Security Agency (NSA), the Central Intelligence Agency (CIA), the Defense Intelligence Agency (DIA), the Federal Bureau of Investigation (FBI), and the Secret Service. Also joined as defendants are three communications corporations, Western Union International, RCA Global Communications, and ITT World Communications. The plaintiffs allege that the coordinated actions of the defendants violated their rights under the Constitution[1] and statutes[2] of the United States. Specifically, plaintiffs allege that the NSA conducted warrantless interceptions of their international wire, cable and telephone communications at the request of the other federal defendants and with the cooperation of the corporate defendants. Plaintiffs seek declaratory and injunctive relief as well as damages.
 
 
 2
 The issue before us is: should the NSA be ordered to disclose whether international communications of the plaintiffs have been acquired by the NSA and disseminated to other federal agencies? The Secretary of Defense avers that admitting or denying the acquisitions would reveal important military and state secrets respecting the capabilities of the NSA for the collection and analysis of foreign intelligence.
 
 
 3
 A brief description of NSA and its functions is appropriate. NSA itself has no need for intelligence information; rather, it is a service organization which produces intelligence in response to the requirements of the Director of Central Intelligence. Intelligence Activities: Hearings Before the Select Comm. to Study Governmental Operations with Respect to Intelligence Activities of the U.S. Senate, 94th Cong., 1st Sess. Vol. V at 9 (1975) (Hearings). The mission of the NSA is to obtain intelligence from foreign electrical communications. Signals are acquired by many techniques. The process sweeps up enormous numbers of communications, not all of which can be reviewed by intelligence analysts. Using "watchlists" lists of words and phrases designed to identify communications of intelligence interest[3] NSA computers scan the mass of acquired communications to select those which may be of specific foreign intelligence interest. Only those likely to be of interest are printed out for further analysis, the remainder being discarded without reading or review. Intelligence analysts review each of the communications selected. The foreign intelligence derived from these signals is reported to the various agencies that have requested it (Hearings at 6). Only foreign communications are acquired, that is, communications having at least one foreign terminal (Hearings at 9).
 
 
 4
 Two separate NSA operations are in issue here. From 1967 to 1973 the NSA conducted operation MINARET as a part of its regular signals intelligence activity in which foreign electronic signals were monitored. The second operation, SHAMROCK, employed different methods. It involved the processing of all telegraphic traffic leaving or entering the United States. NSA obtained these telegrams with the cooperation of the corporate defendants, and the telegrams were delivered to NSA in the form of paper tapes microfilm copies, or magnetic tapes.
 
 
 5
 All material acquired through MINARET and SHAMROCK was processed in the same manner. NSA included on the watchlists the names of United States citizens which were supplied by the FBI, the Secret Service, the CIA, the Bureau of Narcotics and Dangerous Drugs, and the military intelligence services. These agencies sought information in connection with their responsibilities to investigate such areas as international narcotics trafficking, executive protection, terrorism, and possible foreign influence over domestic organizations. The names of approximately 1200 Americans were included on the watchlists at one time or another and NSA disseminated about 2000 reports to the requesting agencies. The reports were edited or summarized versions of the messages acquired. This procedure was followed with all acquisitions, both MINARET and SHAMROCK, to conceal their source.
 
 
 6
 The federal defendants responded to the plaintiffs' allegations concerning both NSA programs by filing a motion to dismiss based upon a formal claim of the state secrets privilege by the Secretary of Defense. In an open affidavit asserting the claim, the Secretary stated that:
 
 
 7
 Civil discovery or a responsive pleading which would (1) confirm the identity of individuals or organizations whose foreign communications were acquired by NSA, (2) disclose the dates and contents of such communications, or (3) divulge the methods and techniques by which the communications were acquired by NSA, would severely jeopardize the intelligence collection mission of NSA by identifying present communications collection and analysis capabilities.
 
 
 8
 (J.A. 39) Along with the open record affidavit, the Secretary submitted a classified affidavit for In camera examination by the court. After some procedural maneuvering in which the plaintiffs attempted to postpone the In camera inspection by the court and succeeded in obtaining a limited amount of discovery, the District Court upheld the claim of privilege with respect to operation MINARET. The court dismissed the claims which were predicated upon the privileged acquisitions because the ultimate issue, the fact of acquisition, could neither be admitted nor denied.
 
 
 9
 Regarding the activities pertaining to wire or telegraphic communications alleged to have been sent by certain of the plaintiffs within the United States and to have been acquired by NSA through the SHAMROCK source, the court found
 
 
 10
 in view of matters which have to date been made public about the SHAMROCK source, the claim of privilege cannot be extended to preclude the federal defendants from admitting or denying the fact Vel non of acquisition of a plaintiff's communication originated in the United States for transmission abroad, where it conclusively can be determined from records and materials now retained by NSA that such communication was obtained through the SHAMROCK source.
 
 
 11
 (J.A. 112-13) Accordingly, the court ordered the defendants to respond to the allegations in the complaint concerning SHAMROCK materials.
 
 
 12
 The District Court entered a partial final judgment with respect to the dismissal, See Fed.R.Civ.P. 54(b), and certified the question of the rejection of the state secrets privilege to this court under 28 U.S.C. § 1292(b). The plaintiffs and the federal defendants each appeal from that part of the ruling adverse to them.
 
 
 13
 The plaintiffs attack the District Court's ruling on three fronts. They argue first that the procedure followed by the District Court to resolve the state secrets privilege question unfairly denied them an opportunity to litigate their constitutional claims. On the merits, they challenge the substantive conclusion that the mere admission or denial of acquisition is a state secret. Alternatively, plaintiffs contend that assuming the state secrets question was properly resolved, dismissal is inappropriate because they could go forward with their claims based upon confirmation of the existence of any of their names on the watchlists. The federal defendants support the court's ruling with respect to MINARET, but contend that the court incorrectly denied the claim of privilege with respect to the SHAMROCK source.
 
 
 14
 We conclude that the decision of the District Court was procedurally sound, that the court correctly determined the state secrets question regarding MINARET and that the mere existence of any of the plaintiffs' names on a watchlist is insufficient to maintain this action. Further, we hold that the court erred in failing to recognize the privilege with respect to the SHAMROCK source.
 
 PROCEDURE
 
 15
 Plaintiffs argue that the procedures followed by the District Court yielded extraordinary control over this litigation to the Secretary of Defense and unfairly denied them their right to litigate their claims. The focus of the attack is upon the court's consideration of three In camera affidavits and the In camera testimony of the Deputy Director of NSA.
 
 
 16
 It is settled that In camera proceedings are an appropriate means to resolve disputed issues of privilege, See Kerr v. United States District Court, 426 U.S. 394, 405-06, 96 S.Ct. 2119, 48 L.Ed.2d 725 (1976); United States v. Nixon, 418 U.S. 683, 714-15, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); United States v. Reynolds, 345 U.S. 1, 10, 73 S.Ct. 528, 97 L.Ed. 727 (1953), albeit one to be invoked cautiously, Vaughn v. Rosen, 157 U.S.App.D.C. 340, 345, 484 F.2d 820, 825 (1973), Cert. denied, 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974). Plaintiffs do not quarrel with this proposition; rather, they argue that the District Court failed to follow the procedures outlined in our opinion in Phillippi v. CIA,178 U.S.App.D.C. 243, 546 F.2d 1009 (1976), a Freedom of Information Act case in which the CIA, on grounds of national security, refused either to confirm or deny the existence of requested records. Sensitive to the difficulty of making decisions In camera "without benefit of criticism and illumination by a party with the actual interest in forcing disclosure,"[4] we held that the Agency should
 
 
 17
 provide a public affidavit explaining in as much detail as is possible the basis for its claim that it can be required neither to confirm nor to deny the existence of the requested records. The Agency's arguments should then be subject to testing by appellant, who should be allowed to seek appropriate discovery when necessary to clarify the Agency's position or to identify the procedures by which that position was established. Only after the issues have been identified by this process should the District Court, if necessary, consider arguments or information which the Agency is unable to make public.
 
 
 18
 178 U.S.App.D.C. at 247, 546 F.2d at 1013 (footnote omitted).
 
 
 19
 Specifically, plaintiffs argue that before the court considered In camera material, they should have been afforded an opportunity to depose the Secretary of Defense, or to propound interrogatories to test his affidavit asserting the state secrets privilege. The District Court refused to permit oral examination of the Secretary, either by deposition or before the court, but the court did rule that plaintiffs could have discovery concerning SHAMROCK through interrogatories approved in advance by the court.
 
 
 20
 Accordingly plaintiffs filed their first set of interrogatories to the Secretary. The court refused to approve these because in the court's opinion they sought "the ultimate answers to questions which defendants have claimed could not be answered without jeopardizing national security issues"; instead the District Court formulated its own interrogatories to which the Secretary responded. Arguing that the answers to the court's questions raised new issues which they were entitled to explore on the public record, plaintiffs then submitted a second set of interrogatories. Defendants responded to the second set of interrogatories with an In camera affidavit by the Director of NSA, and proffered the Ex parte, in camera testimony of the Deputy Director of NSA. At this point the District Court reviewed the In camera affidavits and heard the Ex parte, in camera testimony of the Deputy Director.
 
 
 21
 Plaintiffs contend that the District Court erred in not accepting their first set of interrogatories which asked defendants to explain how answers to certain questions formulated by plaintiffs would jeopardize the intelligence mission of NSA. We agree that their questions properly asked for an explanation of the assertion that the confirmation or denial of the allegations in the complaint with respect to SHAMROCK would compromise state secrets. But the questions propounded by the court likewise asked for an explanation; therefore, we find no prejudicial error in the restatement of the interrogatories by the court.
 
 
 22
 In the peculiar circumstances of this case, we think the limited amount of discovery permitted here satisfied the concerns expressed in the Phillippi case. This is not a Freedom of Information Act case with large amounts of material at issue, necessitating careful procedures to enable the parties to sort out material that can be disclosed and to focus the court's attention on material about which there is a genuine issue. In such a case, counsel's ingenuity in restating a request or in agreeing upon certain exclusions often produces all the material desired. In the case before us the acquisition of the plaintiffs' communications is a fact vital to their claim. No amount of ingenuity of counsel in putting questions on discovery can outflank the government's objection that disclosure of this fact is protected by privilege. Thus, in these special circumstances, we conclude that affording additional discovery for the government to parry the plaintiffs' request would be fruitless. In camera resolution of the state secrets question was inevitable.
 
 
 23
 Plaintiffs argue that once the District Court decided to conduct In camera review of the affidavits and to hear In camera testimony, counsel for the plaintiff should have been permitted to participate under a protective order. Plaintiffs rely upon our recent decisions in Dellums v. Powell, 182 U.S.App.D.C. 244, 253, 561 F.2d 242, 251, Cert. denied, 434 U.S. 880, 98 S.Ct. 234, 54 L.Ed.2d 160 (1977) and Black v. Sheraton, 184 U.S.App.D.C. 46, 60, 564 F.2d 531, 545 (1977) as well as the Supreme Court's decision in United States v. Nixon, 418 U.S. 683, 715 n. 21, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). None of these decisions, however, involved a state secrets claim; in fact, we expressly distinguished the privilege at issue in the Dellums and Black cases from one in which a state secrets privilege is claimed. Dellums, 182 U.S.App.D.C. at 248, 561 F.2d at 246; Black, 184 U.S.App.D.C. at 57, 564 F.2d at 542. And the Court in United States v. Nixon strongly indicates that state secrets are not analogous to the Presidential communications at issue there. 418 U.S. at 710, 94 S.Ct. 3090. Moreover, the Special Prosecutor, who the Court indicated could be included in the In camera proceedings ordered in that case, was himself an employee of the government.
 
 
 24
 A ranking of the various privileges recognized in our courts would be a delicate undertaking at best, but it is quite clear that the privilege to protect state secrets must head the list. The state secrets privilege is absolute. However helpful to the court the informed advocacy of the plaintiffs' counsel may be, we must be especially careful not to order any dissemination of information asserted to be privileged state secrets. "It is not to slight judges, lawyers, or anyone else to suggest that any such disclosure carries with it serious risk that highly sensitive information may be compromised." Alfred A. Knopf, Inc. v. Colby, 509 F.2d 1362, 1369 (4th Cir.), Cert. denied, 421 U.S. 992, 95 S.Ct. 1999, 44 L.Ed.2d 482 (1975). We agree with the court in Jabara v. Kelley, that
 
 
 25
 (i)n the case of claims of military or state secrets' privilege, however, the superiority of well-informed advocacy becomes less justifiable in view of the substantial risk of unauthorized disclosure of privileged information. As the court stated in Heine v. Raus, 399 F.2d 785, 791 (4th Cir., 1968):
 
 
 26
 Disclosures In camera are inconsistent with the normal rights of a plaintiff of inquiry and cross-examination, of course, but if the two interests cannot be reconciled, the interest of the individual litigant must give way to the government's privilege against disclosure of its secrets of state.
 
 
 27
 75 F.R.D. 475, 486-87 (E.D.Mich.1977). Protective orders cannot prevent inadvertent disclosure nor reduce the damage to the security of the nation which may result. Therefore we reject the plaintiffs' argument that counsel should have been permitted to participate in the In camera proceedings below. See Phillippi v. CIA, supra, 178 U.S.App.D.C. at 247, 546 F.2d at 1013.[5]
 
 
 28
 Finally, plaintiffs contend that the District Court's "nearly verbatim adoption of findings of facts prepared by defendants' counsel compounded the error in denying plaintiffs any meaningful role in (the) case." Brief at 34 (footnote omitted). The argument is without merit. The proposed order and memorandum submitted by defendants reflected the tentative conclusions expressed by the court during a status hearing. We have no reason to suspect this case received less than full consideration by the District Court.
 
 
 29
 Therefore we reject the procedural attack upon the decision of the District Court and turn our attention to the merits of the privilege claim.
 
 THE STATE SECRETS PRIVILEGE
 
 30
 Plaintiffs argue that the state secrets privilege cannot extend to the "mere fact of interception" of their communications.[6] Further, they contend that similar disclosures in another case, Jabara v. Kelley, 75 F.R.D. 475 (E.D.Mich.1977) have occurred without repercussions on the national security.
 
 
 31
 In his initial assertion of the privilege, quoted above at 5, the Secretary asserted that NSA intelligence collection and analysis capabilities would be jeopardized if he were required to identify whose foreign communications were acquired, or to disclose the dates or contents of the acquired communications. He also stated that he could not divulge the methods or techniques employed by NSA without endangering the Agency's ability to carry out its mission. Plaintiffs interpret the Secretary's position to mean that identification of the circuits which NSA monitors would jeopardize national security by alerting targets of foreign intelligence interest that messages sent over those circuits are acquired. Plaintiffs suggest, however, that admission or denial of the fact of acquisition of their communications without identification of acquired messages would not reveal which circuits NSA has targeted or the methods and techniques employed.
 
 
 32
 The plaintiffs' argument is naive. A number of inferences flow from the confirmation or denial of acquisition of a particular individual's international communications. Obviously the individual himself and any foreign organizations with which he has communicated would know what circuits were used. Further, any foreign government or organization that has dealt with a plaintiff whose communications are known to have been acquired would at the very least be alerted that its communications might have been compromised or that it might itself be a target. If a foreign government or organization has communicated with a number of the plaintiffs in this action, identification of which plaintiffs' communications were and which were not acquired could provide valuable information as to what circuits were monitored and what methods of acquisition were employed. Disclosure of the identities of senders or recipients of acquired messages would enable foreign governments or organizations to extrapolate the focus and concerns of our nation's intelligence agencies.
 
 
 33
 It requires little reflection to understand that the business of foreign intelligence gathering in this age of computer technology is more akin to the construction of a mosaic than it is to the management of a cloak and dagger affair. Thousands of bits and pieces of seemingly innocuous information can be analyzed and fitted into place to reveal with startling clarity how the unseen whole must operate. As the Fourth Circuit Court of Appeals has observed:
 
 
 34
 The significance of one item of information may frequently depend upon knowledge of many other items of information. What may seem trivial to the uninformed, may appear of great moment to one who has a broad view of the scene and may put the questioned item of information in its proper context. The courts, of course, are ill-equipped to become sufficiently steeped in foreign intelligence matters to serve effectively in the review of secrecy classifications in that area.
 
 
 35
 United States v. Marchetti, 466 F.2d 1309, 1318 (4th Cir.), Cert. denied, 409 U.S. 1063, 93 S.Ct. 553, 34 L.Ed.2d 516 (1972); Cf. Bell v. United States, 563 F.2d 484, 487 (1st Cir. 1977).
 
 
 36
 The standard of review here is a narrow one. Courts should accord the "utmost deference" to executive assertions of privilege upon grounds of military or diplomatic secrets. United States v. Nixon, 418 U.S. 683, 710, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). The court need only be satisfied that " there is a Reasonable danger that compulsion of the evidence will expose military matters which, in the interest of national security, should not be divulged." United States v. Reynolds, 345 U.S. 1, 10, 73 S.Ct. 528, 533, 97 L.Ed. 727 (1953) (emphasis added). We note that in the analogous context of the national security exemption in the Freedom of Information Act courts should accord "substantial weight" to the affidavit of the agency. S.Rep.No.1200, 93d Cong., 2d Sess. 12 (1974) U.S.Code Cong. & Admin.News 1974, p. 6267 (Conference Report); 120 Cong.Rec. 36,870 (1974) (remarks of Sen. Muskie); Goland v. CIA, No. 76-1800 Slip Op. at 20 n.64 (May 23, 1978); Weissman v. CIA, 184 U.S.App.D.C. 117, 122, 565 F.2d 692, 697 & n.10 (1977).
 
 
 37
 The Secretary has asserted in his public affidavit that confirmation of the identity of individuals or organizations whose communications were acquired by NSA "would severely jeopardize the intelligence collection mission of NSA by identifying present communications collection and analysis capabilities." Supra, at ----, 598 F.2d at 5. In most cases this would be sufficient to sustain the claim of privilege. Here, however, plaintiffs' suit depends upon the discovery of this information. Because it is the showing of necessity that determines how deeply the court must probe to satisfy itself of the validity of the claim, United States v. Reynolds, supra, 345 U.S. at 11, 73 S.Ct. 528, the court below examined the In camera affidavits and testimony. We think this was proper. Moreover, we have reviewed the In camera materials ourselves and they reinforce our conclusion from the open affidavits that the state secrets claim must be upheld. The identification of the individuals or organizations whose communications have or have not been acquired presents a reasonable danger that state secrets would be revealed.
 
 
 38
 Plaintiffs' second argument is that the government has admitted NSA acquisition of communications in another case, Jabara v. Kelley, supra, which plaintiffs claim is indistinguishable from the case here. In the Jabara Case the government admitted that six of the plaintiff's communications had been acquired by the NSA. The genesis of that disclosure is unclear. The government tells us it was inadvertent that the court identified the NSA as the acquiring agency after the FBI had admitted receiving summaries from "another agency." The plaintiffs retort, with some force, that after this singular disclosure was made by the court, the government responded to interrogatories admitting the acquisition and giving the approximate dates.
 
 
 39
 The precise circumstances of the disclosure in the Jabara case, however, need not concern us. Whether the disclosure there was inadvertent or intentional is irrelevant here. The government is not estopped from concluding in one case that disclosure is permissible while in another case it is not. As we have said, the identity of particular individuals whose communications have been acquired can be useful information to a sophisticated intelligence analyst. We see nothing inconsistent with the Secretary's assertion of the privilege here and the disclosure that occurred in the Jabara case.
 
 
 40
 The official defendants appeal from the District Court's decision not to dismiss the allegations of NSA activity directed at the plaintiffs' outgoing international telegrams, the so-called SHAMROCK source. As we have seen, Supra at ----, 598 F.2d at 5, the court found that the claim of privilege could not preclude confirmation that a plaintiff's foreign telegrams were or were not acquired by NSA through the SHAMROCK source. The court thought congressional committees investigating intelligence matters had revealed so much information about SHAMROCK that such a disclosure would pose no threat to the NSA mission.
 
 
 41
 In response to the District Court's interrogatories questioning the claim of privilege with respect to the SHAMROCK source, the Secretary filed an open affidavit in which he averred that all acquisitions, whether MINARET or SHAMROCK, were processed identically. The reports consisted of edited and summarized versions of the messages. He further asserted that the original messages had been destroyed. The corporate defendants also discarded copies of the traffic they handle.
 
 
 42
 The District Court restricted its order respecting communications of a plaintiff to instances "where it conclusively can be determined from (NSA) records . . . that (a) communication was obtained through the SHAMROCK source." Supra at ----, 598 F.2d at 5. Even if some SHAMROCK items might be segregated by some means unknown to us, we think the affidavits and testimony establish the validity of the state secrets claim with respect to both SHAMROCK and MINARET acquisitions; our reasoning applies to both. There is a "reasonable danger", United States v. Reynolds, supra, 345 U.S. at 10, 73 S.Ct. at 528, that confirmation or denial that a particular plaintiff's communications have been acquired would disclose NSA capabilities and other valuable intelligence information to a sophisticated intelligence analyst.
 
 PRESUMPTION OF ACQUISITION
 
 43
 Alternatively, plaintiffs contend that even if the state secrets privilege does extend to the fact of acquisition, the inclusion of a plaintiff's name on any watchlist submitted to NSA by the CIA, FBI, DIA, or the Secret Service, presents a Prima facie case of acquisition; therefore, dismissal was inappropriate. The argument has superficial appeal. The Secretary has not asserted that the lists submitted to NSA by these agencies are state secrets. The disclosures by the Senate Select Committee on Intelligence indicate that some 2000 reports were distributed by the NSA from 1969 to 1973. Final Report of the Senate Select Comm. to Study Governmental Operations with Respect to Intelligence Activities, S.Rep.No.755, 94th Cong., 2d Sess. Vol. III at 743 (1976). A total of 1200 names of Americans appeared on the watchlists during this period. Hearings, Vol. V at 12. Thus if any of the 27 plaintiffs was among these 1200, it is possible that such plaintiff's international communications were acquired. Reflection, however, reveals difficulties in proceeding with this action on the basis of such a presumption.
 
 
 44
 The underlying premise of the argument is that the defendants should not be permitted to avoid liability for unconstitutional acts by asserting a privilege which would prevent plaintiffs from proving their case. Cf. Alderman v. United States, 394 U.S. 165, 184-85, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969). The premise is faulty. The defendants are not asserting the privilege to shield allegedly unlawful actions; the state secrets privilege asserted here belongs to the United States and is asserted by the United States which is not a party to the action. It would be manifestly unfair to permit a presumption of acquisition of the watchlisted plaintiffs' international communications to run against these defendants.[7]
 
 
 45
 Moreover, before we could recognize a presumption such as plaintiffs urge upon us we would need to know with some certainty that the existence of a name on a watchlist creates a reasonable likelihood that warrantless acquisitions of communications sent by or to that individual have occurred. Yet the available information points to no such correlation. The watchlists were used to select out communications of interest to the intelligence community; thus it appears that if a message only mentioned a name on the watchlist it would be selected by the computers for further processing. To the extent the reports resulted from acquisitions that only mentioned individuals on the watchlist, they are not relevant to this action. We have no way of knowing, without requiring disclosures which we have held to be privileged, how many of the 2000 reports generated by NSA were to or from individuals on the watchlist and how many were merely those mentioning them.[8] With such uncertainty about the number of relevant reports, the conclusion that the mere existence of a name on the watchlist indicates that one or more of the individual's communications has been acquired and analyzed by NSA is not reasonable. Therefore, we must reject the plaintiff's argument that the acquisition of a plaintiff's communications may be presumed from the existence of a name on the watchlist. Not only would such a presumption be unfair to the individual defendants who would have no way to rebut it, but it cannot be said that the conclusion reasonably follows from its premise.
 
 CONCLUSION
 
 46
 We conclude that the Secretary's claim of privilege should be upheld in its entirety. Therefore, that part of the District Court's order rejecting the claim of privilege and requiring the defendants to respond to the allegations in the complaint referring to operation SHAMROCK is reversed. In all other respects the decision is affirmed. The case is remanded to the District Court for further proceedings consistent with this opinion.
 
 
 47
 So ordered.
 
 On Petition for Rehearing En Banc
 
 48
 Before WRIGHT, Chief Judge, and BAZELON, TAMM, LEVENTHAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges.
 
 ORDER
 
 49
 PER CURIAM.
 
 
 50
 The suggestion of appellants' Adele Halkin, et al., for rehearing en banc having been transmitted to the full court and there not being a majority of the judges in regular active service in favor of having this case reheard en banc, it is
 
 
 51
 ORDERED by the court, En banc that the aforesaid suggestion for rehearing En banc is denied.
 
 
 52
 WRIGHT, Chief Judge, and BAZELON and ROBINSON, Circuit Judges, would grant rehearing en banc.
 
 
 53
 Statement of BAZELON, Circuit Judge, with whom WRIGHT, Chief Judge, joins, as to why he voted for rehearing en banc.
 
 I.
 
 54
 Appellants in this case, individuals who were active and vocal opponents of the Vietnam War, challenge the constitutionality of certain warrantless surveillance activities allegedly conducted by the National Security Agency (NSA).[1] The government, invoking an evidentiary "privilege" based on "state secrets" declined to answer certain portions of appellants' complaint. A panel of this court has now upheld this claim of privilege in a decision that is dangerously close to an open-ended warrant to intrude on liberties guaranteed by the Fourth Amendment. Because I feel that the panel has clearly misconceived the nature of the so-called "state secrets privilege" and the standard of review applicable to the assertion of that privilege, I voted to rehear this case En banc.
 
 
 55
 The panel's analysis contains two fundamental flaws. First, the panel fails to assess the compelling countervailing interest in disclosure before upholding the claim of privilege, contrary to the teaching of United States v. Reynolds, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953). Second, the panel defers to the executive invocation of the privilege without making the De novo assessment of the propriety of the privilege required by this court's decisions in such cases as Ray v. Turner, 190 U.S.App.D.C. 290, 587 F.2d 1187 (1978).
 
 II.
 
 56
 In United States v. Reynolds, the Supreme Court made clear that any claim of privilege must be measured against the need for the information that the government seeks to suppress. "Where there is a strong showing of necessity, the claim of privilege should not be lightly accepted . . . ."[2] It is difficult to imagine a stronger instance of need than this case. Unlike Reynolds, where the "state secret" was only coincidental to the plaintiffs' tort suit, and did not preclude litigation of the case, upholding the privilege in this case precludes all judicial scrutiny of the signals intelligence operations of NSA, regardless of the degree to which such activity invades the protections of the Fourth Amendment.[3] The necessity to which Reynolds directs us to look is, in this case, twofold: (1) The information is necessary if plaintiffs' suit is to continue and (2) it is necessary to assure that simply because private communications become entangled with sophisticated intelligence gathering methods, the constitutional protections for those communications are not unlawfully and cavalierly tossed aside. The panel opinion notes in passing the first element of necessity;[4] the vital second element the core of plaintiffs' suit is nowhere considered.
 
 
 57
 Only a total disregard for the importance of the Fourth Amendment interest could lead the panel to decide this case without first considering the significance of the Supreme Court's decision in United States v. United States District Court (Keith),[5] and this court's En banc decision in Zweibon v. Mitchell.[6] These two decisions erect firm limits on the authority of the Executive to conduct warrantless surveillance, even in the name of national security.[7] Yet in this case, the panel uses the evidentiary privilege to immunize conduct that appears to be proscribed by the Fourth Amendment.[8] As elaborated by the panel, the privilege becomes a shield behind which the government may insulate unlawful behavior from scrutiny and redress by citizens who are the target of the government's surveillance.
 
 
 58
 The state secrets privilege, weakly rooted in our jurisprudence,[9] cannot and should not be a device for the government to escape the strictures of the Fourth Amendment. "Our system of jurisprudence rests on the assumption that all individuals, whatever their position in government, are subject to federal law."[10] The panel employs an evidentiary privilege to carve out an exception to this basic principle of constitutional limitations on government.
 
 III.
 
 59
 The panel's failure to consider the weighty Fourth Amendment interests at stake in this litigation is exacerbated by its abdication of responsibility for scrutinizing searchingly the government's claim of privilege. The teaching of Reynolds is clear: "(t)he court itself must determine whether the circumstances are appropriate for the claim of privilege."[11] The "utmost deference" which the panel has given the government's Ex parte, in camera assertions[12] is not justified in precedent, conflicts with other decisions of this court as well as Congress' clear mandate for review of national security claims under FOIA, and slights the role of the court in protecting the civil liberties guaranteed by the Fourth Amendment.
 
 
 60
 Courts have a particularly important role in mediating between Fourth Amendment protections and the need of the executive to conduct surveillance for legitimate national security purposes. Even assuming that, in the extreme case, "the most compelling necessity cannot overcome the claim of privilege if the court is ultimately satisfied that military secrets are at stake,"[13] the court itself must make the ultimate determination. "Judicial control over the evidence in a case cannot be abdicated to the caprice of executive officers."[14]
 
 
 61
 While judges should acknowledge, their limitation in areas where they lack expertise,[15] the difficult task of assessing a claim of "state secrets" privilege calls for a particularly judicial expertise balancing the government's need for secrecy against the rights of individuals.[16] As the Supreme Court observed in Keith :
 
 
 62
 We cannot accept the Government's argument that internal security matters are too subtle and complex for judicial evaluation. Courts regularly deal with the most difficult issues of our society. There is no reason to believe that federal judges will be insensitive to or uncomprehending of the issues involved in domestic security cases.[17]
 
 
 63
 The role Congress has assigned the courts in assessing claims of "national security" under the Freedom of Information Act gives further support to the need for an independent, De novo assessment of the government's claim of privilege. In amending FOIA in 1974, Congress explicitly rejected both the Supreme Court's decision in EPA v. Mink,[18] (limiting the courts' role in assessing security classifications under FOIA) and President Ford's argument in opposition to the amendments ("the courts should not be forced to make what amounts to the initial classification decision in sensitive and complex areas where they have no particular expertise."[19] The 1974 Amendments explicitly empower courts to make a De novo determination of the propriety of a security classification.[20]
 
 
 64
 This court has recently affirmed in the independent role of the court under FOIA in Ray v. Turner. We observed:
 
 
 65
 The legislative history underscores that the intent of Congress regarding De novo review stood in contrast to, and was a rejection of, the alternative suggestion proposed by the Administration and supported by some Senators: that in the national security context the court should be limited to determining whether there was a reasonable basis for the decision by the appropriate official to withhold the document.[21]
 
 
 66
 The standard applied by the panel in this case ("utmost deference") directly conflicts with our decision in Ray, and produces the anomalous result that a FOIA requester, who may have no special need for the requested information,[22] is given broader access to government information than a plaintiff who requires the information in order to pursue remedies for violation of constitutional rights. Thus, far from taking into account the plaintiffs' need for information, as required by Reynolds, the panel has stood Reynolds on its head and penalized the plaintiffs precisely because their need differs from that of the public at large. Not only does this result defy common sense, but ultimately it will simply lead to a waste of judicial resources. Henceforth, plaintiffs seeking information in a civil suit will simply file a simultaneous FOIA request to reap the advantage of the broader inquiry under FOIA. Nothing will be gained except duplication and delay.[23]
 
 IV.
 
 67
 The failure to assess De novo the claim of privilege has led the panel to disregard completely the significance of the widespread public disclosures concerning operation SHAMROCK. These disclosures undermine the government's Ex parte assertion that simply admitting acquisition of some of plaintiffs' messages will pose a danger to national security.
 
 
 68
 The disclosures concerning SHAMROCK are extensive. SHAMROCK was the subject of extensive hearings before the Senate Select Committee, and is discussed at length in that Committee's Report.[24] Even more pertinent are NSA's disclosures in Jabara v. Kelly,[25] where the government not only admitted that NSA had acquired six of Jabara's messages, but went on to disclose the place from which the intercepted messages originated.[26] In several FOIA cases NSA has further expanded the store of public knowledge concerning SHAMROCK,[27] although in those cases the NSA has not revealed "whether the material . . . was derived from the interception of the (FOIA plaintiffs) own messages or the interception of messages between other parties which included reference to plaintiffs' names."[28] Most recently, a district judge in the District of Columbia has again allowed access to SHAMROCK derived material under FOIA.[29] Nor should it be forgotten that the district judge in this case, who had the benefit of NSA's In camera, ex parte testimony was also unconvinced that admitting acquisition of the SHAMROCK material would pose any reasonable danger to national security sufficient to uphold the government's claim of privilege.[30]
 
 
 69
 Taken together, these developments demonstrate that the panel could have reached its decision only by taking the government's Ex parte affidavits at face value and refusing to assess their credibility in light of reason and the information already made public, the minimal elements of De novo review. My own examination of the In camera affidavits reinforces this conclusion.[31] To my mind, the panel engaged in the "willing suspension of disbelief." The Constitution simply does not permit the courts such a luxury.[32]
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 294(d)
 1 U.S.Const. Amends. I, IV, V, IX.
 
 
 [2]
 18 U.S.C. §§ 2510-20; 47 U.S.C. § 605; 50 U.S.C. § 403(d)(3)
 
 
 [3]
 The watchlists are developed by the NSA to fulfill the needs of various government agencies that use intelligence information which might be obtained from signals intelligence. In the past, the agencies stated their needs to NSA which created selection terms likely to produce the requested information. Presently, a Policy Review Committee of the National Security Council screens requests which must be validated as legitimate foreign intelligence needs. This committee consists of the Vice President, the Secretary of State, the Secretary of the Treasury, the Secretary of Defense, the Assistant to the President for National Security Affairs, the Chairman of the Joint Chiefs of Staff, and the Director of Central Intelligence. Exec.Order 12,036, 43 Fed.Reg. 3673 (1978)
 
 
 [4]
 Vaughn v. Rosen, supra, 157 U.S.App.D.C. at 345, 484 F.2d at 825
 
 
 [5]
 Our recent decision in United States v. American Telegraph & Telephone Co., 185 U.S.App.D.C. 254, 567 F.2d 121 (1977) is not to the contrary. Our remand there expressly authorized the District Court in its discretion to permit counsel for a subcommittee of the House of Representatives to participate in the In camera proceedings. Pointing out that the power must be exercised "gingerly," particularly with respect to documents which the Executive has determined are especially sensitive, we said "(i)t is to be used only if the court finds it necessary in order that it may engage in a considered way in the judicial function we have outlined." 185 U.S.App.D.C. at 266, 567 F.2d at 133. Our purpose in the AT&T case was to avoid a serious constitutional clash between the Executive and Legislative Branches, each claiming an absolute right to the documents at issue. In attempting to facilitate an accommodation, we endorsed extraordinary measures. The present case does not require such measures. Although the plaintiffs' allegations involve serious constitutional claims, as private parties they cannot override a properly invoked state secrets privilege. What is more important, our review of the In camera materials convinces us that the proper determination of the state secrets issue in this case did not require plaintiffs' counsel
 
 
 [6]
 Plaintiffs concede that the procedures followed to assert the privilege here were proper. See United States v. Reynolds, supra, 345 U.S. at 7-8, 73 S.Ct. 528
 
 
 [7]
 Although a good faith defense would be available to the individual defendants, See Zweibon v. Mitchell, 170 U.S.App.D.C. 1, 77-80, 516 F.2d 594, 670-73 (1975), Cert. denied, 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976) it does not justify creating a presumption of liability here. These defendants would face formidable obstacles either in proving that they were not involved or in explaining their actions if they were involved in the acquisition of a particular plaintiff's communications. See 18 U.S.C. § 798 (1976)
 
 
 [8]
 It is not unlikely that a substantial number of acquisitions were processed because they were about individuals or groups on the watchlist. Many of these plaintiffs travelled widely in Europe and Asia in connection with their activities in opposition to the war in Vietnam. Several travelled to China, Laos, and North Vietnam, others met with North Vietnamese officials in Paris and elsewhere. During the Vietnam conflict communications were obtained by monitoring circuits to and from Hanoi. Hearings, Vol. V at 13. It would hardly be surprising that other circuits likely to be used by the North Vietnamese to communicate with their representatives in Paris and other places were also monitored. Reports of meetings with American anti-war groups would in all likelihood be a part of the traffic acquired on those circuits
 
 
 [1]
 Appellants challenge two particular surveillance operations conducted by NSA, SHAMROCK and MINARET. Both of these projects have been described in some detail in Foreign and Military Intelligence: Final Report of the Senate Select Committee to Study Governmental Operations with Respect to Intelligence Activities, S.Rep.No.94-755, 94th Cong., 2d Sess. (hereinafter Senate Select Committee Report or the Report ). According to the Report, operation SHAMROCK provided the NSA with copies of virtually all telegraphic traffic sent to, from or transiting the United States from 1945 to 1975. It was the largest government interception program affecting Americans, dwarfing CIA's mail opening program by comparison. Report, Bk. III at 740. The second surveillance project, MINARET, involved the interception and dissemination of "the international communications of selected American citizens and groups on the basis of lists of names ('watchlists') supplied by other government agencies." Id. at 739. "The program applied not only to alleged foreign influence on domestic dissent, but also to American groups and individuals, whose activities 'may result in civil disturbances . . . .' " Id., quoting MINARET charter, 7/1/69
 Shortly after this suit was filed, the Secretary of Defense interposed a claim of privilege, arguing that simply admitting or denying the plaintiffs' allegations that NSA had intercepted their communications would disclose "state secrets." After further attempts to elucidate the claim of privilege, including the presentation of In camera affidavits and at least one In camera witness, the district court sustained the claim of privilege "except as it might extend to communications originated within the United States by the plaintiffs and acquired by NSA through its operation and SHAMROCK", Order of June 30, 1977 at 1 (App. 108), because the court concluded "that, in view of matters which have to date been made public about the SHAMROCK source, the claim of privilege cannot be extended to preclude the federal defendants from admitting or denying the fact vel non of acquisition of a plaintiff's communications originated in the United States for transmission abroad, where it conclusively can be determined from records and materials now retained by NSA that such communication was obtained through the SHAMROCK source." Order of June 30, 1977 at 5-6 (App. 112-113). Appellants appealed from that portion of the order dismissing with prejudice parts of their suit; the government obtained certification for an interlocutory appeal of those matters decided adversely to the claim of privilege. On appeal, the panel concluded that the government's claim of privilege should be sustained in its entirety, which in effect, put an end to plaintiffs' suit.
 
 
 [2]
 345 U.S. at 11, 73 S.Ct. at 533
 
 
 [3]
 In this Statement, I refer primarily to the Fourth Amendment claim. However, plaintiffs' statutory claim under § 605 of the Federal Communications Act of 1934 is also substantial. See Senate Select Committee Report, Bk. II at 139 (concluding SHAMROCK was a violation of § 605). Furthermore, significant First Amendment interests are implicated by a surveillance operation targeted at those opposed to government policies
 The close interplay of Fourth and First Amendment protections was noted by Justice Powell in United States v. United States District Court (Keith), 407 U.S. 297, 314, 92 S.Ct. 2125, 2135, 32 L.Ed.2d 752 (1972), where the Court expressly limited the power of the government to intercept communications for the purpose of "national security."
 History abundantly documents the tendency of Government however benevolent and benign its motives to view with suspicion those who most fervently dispute its policies. Fourth Amendment protections become the more necessary when the targets of official surveillance may be those suspected of unorthodoxy in their political beliefs.
 
 
 [4]
 Halkin v. Helms, Nos. 77-1922, 77-1923, 194 U.S.App.D.C. --, ----, 598 F.2d 1, 9 (D.C.Cir., June 16, 1978)
 
 
 [5]
 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972)
 
 
 [6]
 170 U.S.App.D.C. 1, 516 F.2d 594 (1975) (en banc)
 
 
 [7]
 In Keith the Supreme Court held that judicial warrants were required before the government could undertake surveillance of domestic dissidents in internal security matters, where neither the source nor the focus of the dissent was a foreign power. Zweibon extended the same Fourth Amendment protection to a group of domestic dissidents, the Jewish Defense League, where the focus of dissent was the activities of a foreign power, the Soviet Union, and where the government claimed that the dissidents' activities had an adverse effect on national security. Zweibon's narrow holding was stated succinctly: "a warrant must be obtained before a wiretap is installed on a domestic organization that is neither the agent of nor acting in collaboration with a foreign power, even if the surveillance is installed under presidential directive in the name of foreign intelligence gathering for protection of the national security." 170 U.S.App.D.C. at 21, 516 F.2d at 614. Thus, a key issue in Halkin has been left open by Keith and Zweibon whether there is an exemption from the warrant requirement when the government intercepts communications with at least one terminal outside the United States. To say that the question is open, however, is not to deny its importance nor to sanction an analysis of the "state secrets" privilege which forecloses any inquiry into the constitutional rights implicated by unfettered government surveillance of Americans' international communications
 However, the MINARET charter by its very terms appears to offend the thrust of the Supreme Court's decision in Keith. The Senate Select Committee Report noted: "(MINARET) applied not only to alleged foreign influence on domestic dissent but also on American groups and individuals whose activities 'may result in civil disturbances or otherwise subvert the national security of the U.S.' " Bk. III at 739.
 At its height, the watchlist contained the names of 600 Americans (1,200 names of Americans during the life of the program) and produced 2,000 reports disseminated to other agencies during the period 1967-1973. "NSA estimates 10 percent of these reports were derived from communications between two American citizens." Bk. III at 747. Among the communications intercepted and disseminated to government agencies were, according to the Senate Select Committee Report : "discussion of a peace concert; the interest of the wife of a U.S. Senator in peace causes; a correspondent's report from Southeast Asia to his magazine in New York; an antiwar activist's request for a speaker in New York." Bk. II at 108.
 
 
 [8]
 Although the precise question posed in this case on the merits has not fully been answered, See note 7 Supra, we have previously indicated in Zweibon, 170 U.S.App.D.C. at 20-21, 516 F.2d at 613-14 (dictum): "(A)n analysis of the policies implicated by foreign security surveillance indicates that, absent exigent circumstances, all warrantless electronic surveillance is unreasonable and therefore unconstitutional . . . ." (footnote omitted)
 
 
 [9]
 Although the existence of the state secrets privilege "has never been doubted," 8 Wigmore, Evidence § 2378 at 794 (McNaughten Rev.1961), it has surfaced only rarely in the United States. Most cases have concerned commercial litigation, particularly patent cases. See, e. g., In re Grove, 180 F. 62 (3d Cir. 1910); Pollen v. Ford Instrument, 26 F.Supp. 583 (E.D.N.Y.1939); Firth Sterling Steel Co. v. Bethlehem Steel Co., 199 F. 353 (3d Cir. 1912); Pollen v. United States, 85 Ct.Cl. 673 (1937). See also Totten v. United States, 92 U.S. 105, 23 L.Ed. 605 (1875) (contractual claim for espionage services); Republic of China v. National Union Fire Ins., 142 F.Supp. 551 (D.Md.1956) (claim by United States on an insurance policy)
 Only one court has heretofore confronted the clash between two substantial public interests national security and the civil liberties guaranteed by the Bill of Rights in ruling on a claim of "state secrets" privilege. In Jabara v. Kelly, 75 F.R.D. 475 (E.D.Mich.1977), the court faced a challenge to certain electronic surveillance activities which in part overlap with the surveillance challenged in this case. In that case the court upheld the privilege. Significantly the privilege was upheld only After the government admitted intercepting Jabara's messages (the very information NSA refuses to divulge here). Id. at 490. Moreover, upholding the privilege in response to Jabara's request for discovery did not have the effect of foreclosing the plaintiff's suit. See also Kinoy v. Mitchell, 67 F.R.D. 1 (S.D.N.Y.1975) (claim for damages arising out of alleged unauthorized electronic surveillance; during discovery government's claim of state secrets denied because the privilege was not properly invoked).
 The constitutional basis of the state secrets privilege is unclear. In Reynolds the Court suggested that the privilege was rooted in the separation of powers. 345 U.S. at 6 n.9, 73 S.Ct. 528. In United States v. Nixon, however, the Court appears to have derived the privilege from the President's Article II duties as Commander in Chief and his responsibility for the conduct of foreign affairs. 418 U.S. 683, 710, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974).
 
 
 [10]
 Butz v. Economou, 438 U.S. 478, 98 S.Ct. 2894, 2910, 57 L.Ed.2d 895 (1978)
 
 
 [11]
 345 U.S. at 8, 73 S.Ct. at 532
 
 
 [12]
 Halkin v. Helms, 194 U.S.App.D.C. at --, 598 F.2d at 9. This standard is derived from the dictum in United States v. Nixon, 418 U.S. at 710, 94 S.Ct. 3090
 
 
 [13]
 Reynolds, 345 U.S. at 11, 73 S.Ct. at 533
 
 
 [14]
 Id. at 9-10, 73 S.Ct. at 533
 
 
 [15]
 See Zweibon, 170 U.S.App.D.C. at 64 n.207, 516 F.2d at 657 n.207
 
 
 [16]
 When the privilege relates to official papers and information sought by the citizen as a means of proof in the assertion of his claims, and the disclosure is opposed as harmful to general security, the question is one of balancing conflicting policies. The head of an executive department can appraise the public interest of secrecy as well (or perhaps in some cases better) than the judge, but his official habit and leaning tend to sway him toward a minimizing of the interest of the individual. . . . The determination of questions of fact and the applications of legal standards thereto in passing upon the admissibility of evidence and the validity of claims of evidential privilege are traditionally the responsibility of the judge. As a public functionary he has respect for the executive's scruples against disclosure and at the same time his duties require him constantly to appraise private interests and to reconcile them with conflicting public policies; he may thus seem better qualified than the executive to weigh both interests understandingly and to strike a wise balance
 McCormick's Handbook of the Law of Evidence (2d ed. 1972) at 235.
 
 
 [17]
 407 U.S. at 320, 92 S.Ct. at 2138 (emphasis added). The Court's observation is applicable to the foreign security context as well:
 Although the judicial competence factor arguably has more force when made in the foreign rather than the domestic security context, the response of Keith to the analogous argument is nevertheless pertinent to any claim that foreign security involves decisions and information beyond the scope of judicial expertise and experience.
 Zweibon, 170 U.S.App.D.C. at 48, 516 F.2d at 641.
 
 
 [18]
 410 U.S. 73, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973)
 
 
 [19]
 Message from President Gerald R. Ford Vetoing H.R.12471, H.Doc.No.93-383, 93d Cong., 2d Sess. (1974)
 
 
 [20]
 5 U.S.C. § 552(b)(1) (1976):
 (b) This section does not apply to matters that are
 (1)(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order . . . .
 On the legislative history of the 1974 Amendments, which make clear Congress' intention for the courts to conduct a De novo review of an agency's decision to withhold documents on national security grounds, See Ray v. Turner, No. 77-1401, 190 U.S.App.D.C. at 293-297, 587 F.2d at 1190-1194 (1978) Id. (Wright, C. J., concurring) at 298-301, 587 F.2d at 1195-1198.
 
 
 [21]
 Ray, 190 U.S.App.D.C. at 296, 587 F.2d at 1193. The panel in the instant case remarks on the "substantial weight" which the Conference Committee indicated should be accorded the agency's affidavit in determining the propriety of withholding documents under Exemption 1. As Chief Judge Wright cogently explained in Ray, the requirement that the affidavit be given substantial weight in no way undercuts the need for De novo review, nor justifies the "utmost deference" which the panel would accord the government's assertion of privilege. See id. (Wright, C. J., concurring) at 316-317, 587 F.2d at 1213-1214
 
 
 [22]
 "The Freedom of Information Act does not depend on a showing of need or interest by the particular applicant for the records. Any showing of need or interest is irrelevant." Forsham v. Califano, 190 U.S.App.D.C. 231 at 237, 587 F.2d 1128 at 1134 (1978); Accord Sterling Drug Inc. v. FTC, 146 U.S.App.D.C. 237, 244, 450 F.2d 698, 705 (1971)
 
 
 [23]
 In discussing Supreme Court Standard 509 Secrets of State and Other Official Information (the proposed Federal Rule of Evidence 509 which was not adopted), one commentator explained the relationship between the evidentiary privilege and the Freedom of Information Act:
 Anything that would be available to a member of the public under the Act should be exempt from the privilege in Standard 509, since a litigant is entitled to relevant information at least as much as a member of the public merits materials for which he need not demonstrate any particular need. Cases ordering disclosures under the Act are therefore pertinent in delineating the kind of information which should be immune to Standard 509 claims of privilege.
 
 
 [2]
 Weinstein's Evidence P 509(06) (1977) at 509-42
 
 
 [24]
 See Report, supra note 1, at Bk. III, pp. 740-41, 765-776
 
 
 [25]
 75 F.R.D. 475 (E.D.Mich.1977). See note 9 Supra
 
 
 [26]
 Appendix (App.) 124. It is noteworthy that NSA did not appeal or otherwise seek reconsideration of the order to disclose the identity of the agency that intercepted Jabara's messages. Nor has NSA offered to demonstrate how the disclosures in Jabara differ in their potential harm to national security from the limited disclosures plaintiffs seek here
 
 
 [27]
 See, e. g., Hayden and Fonda v. NSA, Nos. 76-0286, 76-0287 (D.D.C.); Founding Church of Scientology v. NSA, No. 76-1494, 434 F.Supp. 632 (D.D.C.1977), appeal pending, No. 77-1975 (D.C.Cir.)
 
 
 [28]
 Petition for rehearing at 5 n.7. The NSA's disclosures in Hayden and Fonda and Founding Church of Scientology are contained in affidavits filed in those cases by Norman Boardman, Information Officer of the National Security Agency, attached as Addendum to the Petition for Rehearing
 
 
 [29]
 Baez v. NSA, No. 76-1921 (D.D.C. Nov. 2, 1978). In Baez, Chief Judge Bryant noted that "N.S.A. has already chosen to reveal to plaintiff that some of her communications were intercepted and recorded." Slip op. at 3. The court there ordered the NSA to make public all but two paragraphs of the In camera affidavit filed in that case. See note 31 Infra
 
 
 [30]
 Halkin v. Helms, No. 75-1773 (D.D.C. June 30, 1977) at 5-6:
 With respect to NSA communications interception activities pertaining to wire or telegraphic communications appearing to have been originated by certain of the plaintiffs within the United States and to have been acquired by NSA through the SHAMROCK source, however, the Court finds and concludes that, in view of matters which have to date been made public about the SHAMROCK source, the claim of privilege cannot be extended to preclude the federal defendants from admitting or denying the fact Vel non of acquisition of a plaintiff's communication originated in the United States for transmission abroad, where it conclusively can be determined from records and materials now retained by NSA that such communication was obtained through the SHAMROCK source.
 
 
 [31]
 In its In camera affidavits to the district court, particularly NSA Deputy Director Drake's In camera affidavit of June 17, 1977, NSA seeks to justify its conclusion that admitting or denying acquisition of plaintiffs' messages would pose a danger to national security. Because these affidavits were filed In camera, and in light of the disposition of this case by the panel, and the court en banc, I am precluded from demonstrating in detail why I believe those arguments are insufficient as a matter of law to justify upholding the privilege in this case. However, it is instructive to consider the observations of Judge Bryant in his opinion in Baez, slip op. at 1-2, in a related context:
 The Agency has presented basically three arguments why the disclosure of any information about these documents would threaten the national security or reveal the structure or activities of N.S.A. First of all, foreign governments do not know which international common carrier facilities the N.S.A. is capable of monitoring. Secondly, foreign governments do not know the actual intelligence targets of the N.S.A. And, thirdly, foreign governments do not know the particular communications circuits which the N.S.A. is now monitoring or has in the past monitored. 1
 
 
 [1]
 These arguments have been made by the agency at oral argument in another F.O.I.A. case involving the National Security Agency, Founding Church of Scientology of Washington, D. C. v. National Security Agency, No. 77-1975, 434 F.Supp. 632 (D.C.Cir. argued March 27, 1978)
 The Court finds all three arguments unconvincing. From news articles and congressional investigations the American public, and consequently any aware foreign government, knows that N.S.A. can and does collect most messages to or from the United States transmitted by international common carrier facilities, both private and commercial. This includes messages passed by radio, satellite or other electromagnetic means. Therefore, N.S.A.'s capability to perform this sort of function is public knowledge.
 Similarly, as plaintiff points out, Congress has publicized the fact that N.S.A. is capable of targeting certain persons. It can select, by computer, information about these people from the massive number of collected messages. The N.S.A. did target certain antiwar activists in the past, and so the fact that Joan Baez may have been targeted is not a national security secret.
 Furthermore, the agency is known publicly to be capable of monitoring all messages carried by electromagnetic means, to and from the United States. Even if plaintiff knows on which particular circuit the message was sent, she would know no more than at that particular time the N.S.A. intercepted that circuit. She already knows that the N.S.A. is capable of monitoring any such circuit which originates or ends in the United States.
 Therefore, the Court orders to be made public all but two paragraphs of the In camera affidavit submitted by defendants.
 I also note that the panel never explains why it ignores the distinction between material derived from SHAMROCK and material derived from other sources, which the district judge found to be controlling.
 
 
 [32]
 Congress has already limited some of the pernicious consequences of the panel's opinion in the Foreign Intelligence Surveillance Act of 1978, P.L. 95-511, 92 Stat. 1783. The Act limits electronic surveillance of U.S. citizens and permanent resident aliens in the United States (including international cable communications) to situations where there is probable cause to believe that the target of the communication is a foreign power or an agent of a foreign power, and requires that such surveillance be conducted pursuant to a warrant issued by any of the special judges appointed by the Chief Justice to issue such warrants. Violators of the Act are subject to civil and criminal liability. The purpose of this legislation was "to permit the Government to gather necessary foreign intelligence information by means of electronic surveillance but under limitations and according to procedural guidelines which will better safeguard the rights of individuals." S.Rep.No.95-604 (part I) 95th Cong., 2d Sess. (1978) at 9, U.S.Code Cong. & Admin.News 1978, pp. 3904, 3910. Congress thus saw the two competing needs and struck a balance between them, resolving a tension which the panel in this case has totally failed to recognize or grapple with. I intimate no views on the effect of the Foreign Intelligence Surveillance Act on the instant case, except to observe that its enactment does not dissuade me that this important case should be reheard En banc