Ilse M. SIGLER, as Personal Representative of the Estate of Ralph J. Sigler, Deceased and Ilse M. Sigler, Individually and Karin (Sigler) Mears, Individually

v.

C. J. LeVAN, Individually and as Major General, United States Army; Donald B. Grimes, Individually and as Colonel, United States Army; H. R. Aarons, Individually and as Major General, United States Army; Noel Jones, Individually and as Chief, Special Operations Division, U. S. Army; Carlos Zapata, Individually and as Chief Warrant Officer, United States Army; Francis (Joe) Prasek, Individually and as Special Agent, Federal Bureau of Investigation; Lewis Martel, Individually and as Chief Warrant Officer, United States Army; John Schaffstall, Individually and as Chief Warrant Officer, United States Army; Donnall J. Drake, Individually and as Chief Warrant Officer, United States Army; Odell L. King, Individually and as Chief Warrant Officer, United States Army; Peter Conway, Individually and as Project Officer, U. S. Army Intelligence; Clifford Alexander, Secretary of the Army; Party or Parties Unknown who are or were Members of the Central Intelligence Agency in 1976; Party or Parties Unknown who are or were Members of the Federal Bureau of Investigation in 1976; and Party or Parties Unknown who are or were Members of the United States Army in 1976.

Ilse M. SIGLER, as Personal Representative of the Estate of Ralph J. Sigler, Deceased and Ilse M. Sigler, Individually and Karin (Sigler) Mears, Individually

v.

H. R. AARONS, Individually and as Major General, United States Army Deputy Director, Defense Intelligence Agency and Donald B. Grimes, Individually and as Colonel, United States Army and Noel Jones, Individually and as Chief, Special Operations Division, U. S. Army Intelligence Agency and Lewis Martel, Individually and as Chief Warrant Officer, United States Army and John Schaffstall, Individually and as Chief Warrant Officer, United States Army and Odell L. King, Individually and as Chief Warrant Officer, United States Army and Donnall J. Drake, Individually and as Chief Warrant Officer, United States Army and Peter Conway, Individually and as Project Officer, U. S. Army Intelligence and Carlos Zapata, Individually and as Chief Warrant Officer, United States Army and Party or Parties unknown who are or were Members of the Central Intelligence Agency in 1976 and Party or Parties Unknown who are or were Members of the Federal Bureau of Investigation in 1976 and Party or Parties Unknown who are or who were Members of the United States Army in 1976.

Civ. A. Nos. N–78–1237,[1] N–79–918.[2]

United States District Court,
D. Maryland.

Jan. 7, 1980.

Supplemental Opinion March 12, 1980.

1. This suit was originally filed in the United States District Court for the Western District of Texas, El Paso Division on February 18, 1977 and was transferred to this Court on June 29, 1978.

2. This suit was originally filed in the Circuit Court for Anne Arundel County, Maryland on April 12, 1979 and was removed to this Court on May 14, 1979.

James E. Kenkel and William C. Brennan, Jr., College Park, Md., for plaintiffs.

James M. Kramon, Baltimore, Md., Aubrey M. Daniel, III, and Douglas R. Marvin, Washington, D. C., for defendant LeVan.

Joseph A. Schwartz, III, Baltimore, Md., and James F. Neal and Aubrey B. Harwell, Jr., Nashville, Tenn., and David R. Boyd, Washington, D. C., for defendants Grimes, Aaron, Jones, Martel, Schaffstall, Conway, Drake and King.

Richard R. Beauchemin, Baltimore, Md., and Robert D. Earp, El Paso, Tex., for defendant Zapata.

Alan I. Baron and Ellen Scalettar, Baltimore, Md., for defendant Prasek.

Alice Daniel, Acting Asst. Atty. Gen., Barbara B. O'Malley, R. John Seibert and Raymond M. Larizza, Attys., U. S. Dept. Justice, Washington, D. C., Russell T. Baker, Jr., U. S. Atty. for the District of Maryland and Lynne A. Battaglia, Asst. U. S. Atty., Baltimore, Md., for defendant Alexander.

NORTHROP, Chief Judge.

This litigation involves two actions for damages and injunctive relief arising out of the death of Ralph J. Sigler, an Army counterintelligence agent. Mr. Sigler died by electrocution on April 13, 1976, in a motel room located near Fort Meade, Maryland. The plaintiffs are his wife and daughter. The defendants are the Secretary of the Army, ten present or former officers of the United States Army, a Special Agent of the Federal Bureau of Investigation (FBI), and parties unknown who are or were members of the Central Intelligence Agency (CIA), the FBI, and the United States Army in 1976.[3]

These two actions were consolidated by this Court on September 20, 1979 for the purposes of pleadings, motions, and discovery; the Court reserved until a later time the decision of whether to consolidate these actions for all other purposes. The matter is presently before the Court on the defendants' motions to dismiss pursuant to Rule 12(b) of the Federal Rules of Civil Procedure. The Court conducted a hearing on these motions on October 11, 1979. At that time, the Court requested supplemental briefs on certain issues; having received those briefs, the Court is prepared to render a decision.

I. BACKGROUND

For the purposes of a Rule 12(b) motion, this Court must accept as true the facts alleged in the plaintiffs' complaint, as well as all reasonable inferences that may be deduced from those allegations favorable to the plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

From the late 1960's until his death on April 13, 1976, Mr. Sigler was a counterintelligence agent for the United States Army. His duties included the selling of information concerning United States Army radar and missile systems to intelligence agents of various foreign powers. Mr. Sigler's mission was twofold in nature. First, a portion of the information sold to these foreign powers was deliberately designed to mislead them as to the capability of the Army's radar and missile systems. Secondly, Mr. Sigler was to identify as many foreign intelligence operatives as possible to his superiors.

In 1974, Mr. Sigler was approaching thirty years of active duty with the Army (having enlisted in 1947) and was contemplating retirement. He began to assemble his papers, effects, and memorabilia with the apparent intention of writing a book, after he retired, on his intelligence career. The Army evidently learned of his inten-

---

**3.** The defendants in both cases are the same except for Secretary Alexander, General Le-

Van, and Special Agent Prasek, who are defendants only in Civil Action No. N–78–1237.

tions and in March 1976 ordered Mr. Sigler to San Francisco, California for a debriefing session where he was given a polygraph test. Subsequently, the Army ordered Mr. Sigler to report to Fort Meade, Maryland, the headquarters of the United States Army Intelligence Agency. Mr. Sigler arrived in the Fort Meade area on April 4, 1976.

For the next nine days, Army intelligence officers confined Mr. Sigler to two motel rooms in the Fort Meade area and "subjected Sigler to severe emotional distress by the use of extensive questioning, threats and intimidations." *Plaintiffs' First Amended Complaint*, Civil Action No. N–78–1237 at 17. Apparently this interrogation focused on Mr. Sigler's intention to write his memoirs and the nature and location of the materials he had collected to assist him in writing his book.

During this time, defendant Army Intelligence Officer Louis Martel pressured Mr. Sigler into acknowledging the existence and location of the memoirs material at the Sigler residence in El Paso, Texas. Defendant Martel then coerced Mr. Sigler into calling his wife, Ilse M. Sigler, at their home and instructing her to make certain of the memoirs material available to defendant Army Intelligence Officer John Schaffstall. On April 8, 1976, defendant Schaffstall appeared at the Sigler residence, was granted entrance by Mrs. Sigler, and procured the material in question. Defendant Schaffstall returned to Fort Meade the following day with the material. The interrogation of Mr. Sigler by the defendant counterintelligence agents continued and was of an "extreme and outrageous" nature. *Amended Complaint, supra* at 21. Certain papers and effects belonging to Mr. Sigler were allegedly taken from him during the interrogation.

On April 13, 1976, Mr. Sigler was found dead in a motel room in the Fort Meade area. Official investigations by the Army and the Maryland State Police concluded that Mr. Sigler had committed suicide by wrapping the ends of a stripped electrical lamp cord around his upper arms, plugging the cord into a wall socket, and flipping on the wall switch, which resulted in his death by electrocution. The plaintiffs contend that the defendants were responsible for Mr. Sigler's death by "either 1) causing a current of electricity to pass through his body or 2) placing him in an extreme position of danger by virtue of the continuous emotional strain to which he had been subjected and then failing to protect him" from electrocuting himself. *Amended Complaint, supra* at 17–18.

The plaintiffs have asserted two categories of claims in this matter. The first category represents claims on behalf of Mr. Sigler's estate for alleged injuries to Mr. Sigler and includes claims for (1) intentional infliction of emotional distress; (2) false imprisonment; (3) conversion; (4) gross negligence; (5) wrongful death; (6) violations of the First, Fourth, and Fifth Amendments to the United States Constitution; (7) assault and battery; and (8) replevin. The second category of claims represents alleged injuries to Mrs. Sigler and her daughter individually, and includes claims for (1) conversion; (2) replevin; and (3) violations of the Fourth and Fifth Amendments to the United States Constitution. The two cases consolidated here seek combined damages of over $100 million against the defendants, in addition to injunctive relief against the Secretary of the Army in the form of an order requiring him to return to the plaintiffs the materials taken from the Sigler residence and from the Fort Meade motel room.

The Court will consider separately the motions to dismiss as they apply to the two categories of claims.

## II. THE INJURIES TO RALPH J. SIGLER

### A. *The* Feres *Doctrine*

All of the defendants, except Special Agent Francis (Joe) Prasek of the FBI and the unknown parties in the FBI and CIA, were members of the Army at the time of their alleged involvement in this case. These Army defendants contend that the

claims against them for injuries to Ralph J. Sigler are barred by the *Feres* immunity doctrine.[4] This Court agrees.

In *Feres v. United States,* 340 U.S. 135, 146, 71 S.Ct. 153, 159, 95 L.Ed. 152 (1950), the Supreme Court held that the United States "is not liable under the Federal Tort Claims Act [FTCA] for injuries to servicemen where the injuries arise out of or are in the course of activity incident to service." In referring to the three cases under consideration, the Court stated that "[t]he common fact underlying the three cases is that each claimant, while on active duty and not on furlough, sustained injury due to negligence of others in the armed forces." *Id.* at 138, 71 S.Ct. at 155. Aside from its statutory analysis of the FTCA, the Supreme Court has given several policy justifications for this common law exception to the FTCA's waiver of sovereign immunity. First, the Court in *Feres* characterized the relationship between the Government and members of the Armed Forces as "distinctively federal in character." *Id.* at 143, 71 S.Ct. 153. The Court reasoned that it would therefore be irrational to have the Government's liability to a serviceman depend fortuitously on the state in which the serviceman happened to be stationed. Second, the Court noted that Congress had established other compensation systems that adequately compensated injured servicemen. *Id.* at 144, 71 S.Ct. 153. A third policy reason was developed in *United States v. Brown,* 348 U.S. 110, 112, 75 S.Ct. 141, 99 L.Ed. 139 (1954), where the Court found that military discipline would be adversely affected if a soldier were permitted to sue his superiors and second-guess decisions made in the military chain of command. The *Feres* doctrine was recently reaffirmed by the Supreme Court in *Stencel Aero Engineering Corp. v. United States,* 431 U.S. 666, 97 S.Ct. 2054, 52 L.Ed.2d 665

(1977), a case involving a third party indemnity claim against the United States. *See generally* Note, *From* Feres *to* Stencel: *Should Military Personnel Have Access to FTCA Recovery?,* 77 Mich.L.Rev. 1099 (1979).

Although these Supreme Court cases dealt with suits against the United States under the FTCA, lower federal courts, utilizing the same underlying policy reasons, have extended the *Feres* doctrine to immunize military defendants in their individual capacities. *E. g., Hass v. United States,* 518 F.2d 1138 (4th Cir. 1975); *Bailey v. De-Quevedo,* 375 F.2d 72 (3d Cir. 1967); *Levin v. United States,* 403 F.Supp. 99 (D.Mass. 1975). The courts have further held that *Feres* bars wrongful death suits by a serviceman's family or estate against the United States where the death occurred incident to military service. *E. g., DeFont v. United States,* 453 F.2d 1239 (1st Cir. 1972); *Van Sickel v. United States,* 285 F.2d 87 (9th Cir. 1960). This holds true even when local law gives the heirs of the deceased or his personal representative an original and direct cause of action for the decedent's death. The rationale is that the in-service injury automatically triggers *Feres.* To permit such derivative or original action suits would emasculate the doctrine. Indeed, the *Feres* case dealt with two wrongful death suits by the heirs of the decedent servicemen.

There is no question that, as members of the military, the Army defendants may raise the *Feres* doctrine as a defense to this action. Defendant Prasek and the unknown defendants in the FBI and the CIA did not raise the *Feres* doctrine in their original motions to dismiss.[5] It has become apparent to this Court, however, that *Feres* may also apply to defendant Prasek and the unknown defendants as nonmilitary, governmental employees.

---

4. Defendant Alexander, Secretary of the Army, has not raised this defense in his motion to dismiss, choosing instead to rely on other defenses. It is evident to this Court, however, that the *Feres* doctrine also applies to defendant Alexander. *Cf. Birdwell v. Schlesinger,* 403 F.Supp. 710, 718 (D.Colo.1975) (*Feres* shields

Secretary of Defense and Secretary of the Air Force).

5. On December 4, 1979, this Court received defendant Prasek's supplemental motion to dismiss the complaint in Civil Action No. N–78–1237 on the grounds of the *Feres* doctrine.

The courts that have considered the question are apparently unanimous in their conclusion that *Feres* applies even when the tort-feasor is not a member of the military but is a nonmilitary, governmental employee. *Uptegrove v. United States,* 600 F.2d 1248, 1250–51 (9th Cir. 1979); *Layne v. United States,* 295 F.2d 433 (7th Cir. 1961), *cert. denied,* 368 U.S. 990, 82 S.Ct. 605, 7 L.Ed.2d 527 (1962); *Jaffee v. United States,* 468 F.Supp. 632, 634 (D.N.J.1979); *Watkins v. United States,* 462 F.Supp. 980, 985 (S.D. Ga.1977), *aff'd per curiam,* 587 F.2d 279 (5th Cir. 1979); *Frazier v. United States,* 372 F.Supp. 208 (M.D.Fla.1973); *Sheppard v. United States,* 294 F.Supp. 7 (E.D.Pa.1969). The common theme in these decisions is that the reference to the military status of the alleged tort-feasors in *Feres* was merely a statement of fact rather than a requirement of law. These courts interpret *Feres* to hold that where a member of the military has been injured incident to military service, he cannot recover damages against the United States or any governmental employee, civilian or military.

While the Supreme Court has not directly faced this issue, the Court in *Stencel Aero Engineering Corp. v. United States,* 431 U.S. 666, 669–70, 97 S.Ct. 2054, 52 L.Ed.2d 665 (1977) indicated that *Feres* is not limited to situations where the tort-feasor is a member of the military; the Court used the term "Government officials" when referring to the alleged tort-feasors in *Feres* and *Stencel.* The Fourth Circuit Court of Appeals held that *Feres* can immunize civilian employees of the military. *Hass v. United States,* 518 F.2d 1138, 1141 (4th Cir. 1975). The court cited with seeming approval *United States v. Lee,* 400 F.2d 558 (9th Cir. 1968), *cert. denied,* 393 U.S. 1053, 89 S.Ct. 691, 21 L.Ed.2d 695 (1969). *Lee* held that *Feres* shields nonmilitary, governmental employees as well as civilian employees of the military. Under these circumstances and considering the weight of authority, this Court is compelled to hold that defendant Prasek and the unknown defendants in the FBI and the CIA are entitled to invoke the *Feres* doctrine.

It is beyond dispute that Ralph J. Sigler was a member of the military at the time of his alleged injuries; that his alleged injuries were incurred incident to service; and that the individual defendants were members of the military or the Government at the time of their alleged involvement in this case. Plaintiffs' negligence claims against the defendants are barred by the *Feres* doctrine. *Yolken v. United States,* 590 F.2d 1303 (4th Cir. 1979) (per curiam). The plaintiffs argue, however, that *Feres* does not apply to intentional constitutional violations in a noncombat setting. The plaintiffs fail to recognize the broad scope of *Feres.* While *Feres* dealt with negligence actions, "courts have also uniformly recognized that the *Feres* bar extends to both constitutional and intentional torts" in noncombat situations. *Thornwell v. United States,* 471 F.Supp. 344, 348 (D.D.C.1979) (Richey, J.).

*Thornwell* involved a factual situation similar to the instant case. Plaintiff, an Army private, was allegedly imprisoned and brutally interrogated by Army officers investigating the theft of classified documents. Part of this interrogation allegedly involved the secret drugging of Mr. Thornwell with lysergic acid diethylamide (LSD), a psychedelic chemical, as part of "Operation Third Chance," a covert Army program in human drug experimentation. While recognizing the "unconscionable results" that application of the *Feres* doctrine will sometimes cause, the *Thornwell* court correctly recognized that "neither the language nor the rationale of the [*Feres*] decision indicates that the legal theory of a soldier's claim ought to be a salient factor in determining the scope of intra-military immunity." 471 F.Supp. at 348 & n. 1.

■ *Feres* applies whenever a member of the military is injured incident to service by military or governmental personnel. It is this factual situation that triggers the *Feres* doctrine, rather than the legal theory underlying the plaintiff's claim or whether his injuries occurred in combat. *See, e. g., Citizens National Bank of Waukegan v. United States,* 594 F.2d 1154 (7th Cir. 1979)

(*Feres* controls where Marine allegedly subjected to physical attacks by Marine correctional officers resulting in subsequent suicide); *Nagy v. United States,* 471 F.Supp. 383 (D.D.C.1979) (Smith, J.) (*Feres* bars suit against the United States on constitutional grounds for damages to serviceman arising out of his participation in LSD experiments); *Jaffee v. United States,* 468 F.Supp. 632, 635 (D.N.J.1979) (*Feres* forecloses liability for alleged intentional violations of constitutional rights of soldiers who assertedly were compelled to march into a nuclear explosion; *Feres* not limited to orders given in the heat of battle); *accord, Woodside v. United States,* 606 F.2d 134, 141 (6th Cir. 1979) ("incident to service" test); *cf. Rotko v. Abrams,* 338 F.Supp. 46 (D.Conn.1971), *aff'd per curiam,* 455 F.2d 992 (2d Cir. 1972) (*Feres* applied when death arose out of combat in Vietnam).

As Judge Sirica observed in *Misko v. United States,* 453 F.Supp. 513, 515 (D.D.C. 1978), state tort claims are easily susceptible to restatement as constitutional claims. *Accord, Calhoun v. United States,* 475 F.Supp. 1, 4–5 (S.D.Cal.1977), *aff'd,* 604 F.2d 647 (9th Cir. 1979). Judge Sirica held that the *Feres* immunity doctrine and its rationale apply equally to constitutional claims. Otherwise, *Feres* could be easily abrogated by artful pleading.

The plaintiffs here cite three cases to support their position; none is convincing. The court in *Alvarez v. Wilson,* 431 F.Supp. 136 (N.D.Ill.1977) cites several cases that follow the *Feres* doctrine, but curiously, that court neither cites the *Feres* decision, nor does it discuss the doctrine. The decision therefore cannot be regarded as authoritative, particularly since it rejects a Fourth Circuit case, *Hass v. United States,* 518 F.2d 1138 (4th Cir. 1975), which this Court is obligated to follow. In *Leighton v. Peters,* 356 F.Supp. 900 (D.Haw.1973), the court did not refer to the *Feres* doctrine; it

instead relied on an official immunity theory to find the defendant immune. This Court fails to see the applicability of *Leighton* to this case. The court in *Henderson v. Bluemink,* 167 U.S.App.D.C. 161, 511 F.2d 399 (D.C.Cir.1974), likewise proceeded on an official immunity basis and did not allude to *Feres.* Furthermore, there is no indication in the *Henderson* opinion whether the injured party was a civilian or a member of the military. These three cases fail to refute the application of *Feres* to intentional and constitutional claims.

The alleged incidents of brutality by the Army towards Mr. Sigler fall squarely within the scope of the aforementioned cases following *Feres.* Consequently, all of the plaintiffs' claims against the individual defendants, in their official and individual capacities, seeking damages for intentional, negligent, and constitutional injuries to Ralph J. Sigler are barred by the *Feres* doctrine and must be dismissed.

## B. The State Secrets Privilege

The remaining claim asserted on behalf of Ralph J. Sigler is one for injunctive relief against defendant Alexander under the replevin claim in count ten of the plaintiffs' first amended complaint in Civil Action No. N–78–1237.[6] Plaintiffs allege that the papers and effects taken from the Sigler residence and from Mr. Sigler at the Fort Meade motel room are now in the possession of the Secretary of the Army, Clifford Alexander. The plaintiffs seek an order directing defendant Alexander to return these papers and effects to them.

Defendant Alexander has responded to this claim by filing a motion to dismiss based upon a claim of the state secrets privilege.[7] In support of this motion, the Secretary has executed an open record affidavit asserting a formal claim of the privilege. In his affidavit, the Secretary explains why disclosure of these items would

---

**6.** The monetary relief sought under count ten on behalf of Ralph J. Sigler against defendant Alexander and the other defendants is barred by the *Feres* doctrine as discussed *supra* in the text of this opinion.

**7.** This privilege is sometimes referred to as the military and state secrets privilege. For the sake of simplicity, this Court will refer to it as the state secrets privilege.

seriously jeopardize the national security of the United States:

> The documents and effects listed in the attached inventory explain in great detail, day-by-day, many of the intelligence activities that Mr. Sigler undertook on behalf of the Army. . . . The record also relates the dealings that Mr. Sigler had with the intelligence services of foreign governments: the names of the people he met, the dates, locations, and purposes of the meetings, the substance of their dealings, the activities that Mr. Sigler undertook for them and the information he provided them, the ways in which he communicated with them, and, in general, nearly everything he knew or could glean about the foreign intelligence services.

> . . . . .

> . . . The documents provide a wealth of information about U.S. counterintelligence activities. The information would be of great value to hostile intelligence services since it would facilitate their efforts in identifying and frustrating U.S. intelligence operations. It would show them how the Army identifies, recruits, communicates with, meets with, and uses its intelligence sources. It would reveal much about the organization and activities of the U.S. intelligence agencies and provide an excellent case study of the U.S. intelligence community in question. . . . All of this information would better enable hostile intelligence services to identify our current intelligence operations and to adopt countermeasures that would seriously degrade the national intelligence program.

*Affidavit and Claim of Privilege of the Secretary of the Army* at ¶¶ 4–6. The Secretary requests that none of these items become the subject of litigation in these cases, made a part of the public record herein, or otherwise be disclosed.

Along with the open record affidavit, the Secretary has submitted a classified affidavit for *in camera* examination by the Court. This *in camera* affidavit describes in greater detail the substance of the material being withheld by the Secretary and the harm to our nation's security that would result should this information become public. At the end of the hearing on the defendants' motions to dismiss, this Court examined the *in camera* affidavit in chambers.

■ A state secret is a governmental secret relating to the national defense or the international relations of the United States. Once it is established that a state secret exists, the Government has a privilege to refuse to disclose the secret in civil litigation and to prevent any litigant from disclosing the secret. *See generally* McCormick, Evidence §§ 107 & 110 (Cleary ed. 1972); 2 Weinstein & Burger, Weinstein's Evidence 509[1]–509[4] (1979); 8 Wigmore, Evidence § 2378, at 794–96 (McNaughton rev.1961); 8 Wright & Miller, Federal Practice and Procedure § 2019, at 158–60 (1970).

The privilege against disclosure of state secrets in civil litigation was upheld by the Supreme Court in *United States v. Reynolds,* 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953). In that case, several civilian observers were killed in the crash of an Air Force aircraft that was being used to test secret electronic equipment. Their widows brought suit under the FTCA and sought to discover the Air Force's accident investigation report and the statements of the surviving crew members taken during the official investigation. The Air Force filed a claim of privilege, asserting that these matters involved state secrets. The Supreme Court held that where a court is satisfied "from all the circumstances of the case, that there is a reasonable danger that compulsion of the evidence will expose military matters which, in the interest of national security, should not be divulged," then the material would be absolutely privileged. *Id.* at 10, 73 S.Ct. at 533.

The United States Court of Appeals for the District of Columbia recently reaffirmed this narrow standard of review in *Halkin v. Helms,* 194 U.S.App.D.C. 82, 598 F.2d 1 (D.C.Cir.1978). The plaintiffs in that case alleged that the National Security Agency (NSA) conducted warrantless interceptions of their international wire, cable,

and telephone communications. The governmental defendants filed a motion to dismiss the complaint on the basis that the mere disclosure of whether the plaintiffs' international communications were acquired by the NSA would violate the state secrets privilege. The court of appeals agreed and held that the entire case had to be dismissed "because the ultimate issue [in the case], the fact of acquisition, could neither be admitted nor denied." 194 U.S. App.D.C. at 86, 598 F.2d at 5. *Cf. Jabara v. Kelley,* 75 F.R.D. 475 (E.D.Mich.1977); *Kinoy v. Mitchell,* 67 F.R.D. 1 (S.D.N.Y.1975) (discovery motions); *Republic of China v. National Union Fire Insurance Co.,* 142 F.Supp. 551 (D.Md.1956) (Thomsen, C.J.) (motion to dismiss).

The *Halkin* court emphasized that the "[c]ourts should accord the 'utmost deference' to executive assertions of privilege upon grounds of military or diplomatic secrets." 194 U.S.App.D.C. at 90, 598 F.2d at 9. Despite the devastating effect that the state secrets privilege had on the plaintiffs' case, *i.e.,* dismissal, the court of appeals recognized that our national security takes priority over a litigant's interest in redressing alleged injuries. Once established, the state secrets privilege is absolute.

Plaintiffs' counsel have requested that they be permitted to participate in the *in camera* review of the Secretary's affidavit. They argue that a protective order barring disclosure of the materials would adequately preserve confidentiality. The Court must deny their request.

■ "Protective orders cannot prevent inadvertent disclosure nor reduce the damage to the security of the nation which may result." *Halkin, supra* 194 U.S.App.D.C. at 88, 598 F.2d at 7. As the court in *Jabara v. Kelley,* 75 F.R.D. 475, 486–87 (E.D.Mich. 1977) pointed out, the determination of whether the state secrets privilege applies is a question for the courts to determine without revealing the contents of the allegedly privileged material. In denying

similar requests, both the *Halkin* and *Jabara* courts relied on the following passage from *Heine v. Raus,* 399 F.2d 785, 791 (4th Cir. 1968):

> Disclosures *in camera* are inconsistent with the normal rights of a plaintiff of inquiry and cross-examination, of course, but if the two interests cannot be reconciled, the interest of the individual litigant must give way to the government's privilege against disclosure of its secrets of state.

This Court believes that the potential risks of inadvertent disclosure and ensuing damage to our national security outweigh the benefits to be gained if plaintiffs' counsel are permitted to examine the secret materials and contest the applicability of the state secrets privilege.

■ After carefully examining the Secretary's *in camera* affidavit, this Court is absolutely convinced that disclosure of the items plaintiffs wish returned would reveal sensitive governmental secrets related to the national defense and the international relations of the United States. Disclosure of these materials would unquestionably damage our national security. This Court therefore finds that the Government has met its burden in proving that the materials in question are protected from disclosure by the state secrets privilege. Accordingly, the injunctive relief claim asserted in count ten of the first amended complaint in Civil Action No. N–78–1237 in behalf of Ralph J. Sigler and in behalf of the plaintiffs, individually, must be dismissed.

## II. THE INJURIES TO ILSE M. SIGLER AND KARIN (SIGLER) MEARS

Mrs. Sigler and her daughter have asserted on their own behalf claims of conversion, replevin,[8] and violations of their fourth and fifth amendment rights. These claims arise out of what they characterize as the unlawful search of their home by defendant

---

**8.** The injunctive relief sought by plaintiffs under count ten (replevin) in their first amended complaint in Civil Action No. N–78–1237 is barred by the state secrets privilege as discussed *supra* in the text of the opinion.

Schaffstall and seizure by him of the papers and effects belonging to Mr. Sigler. Their claims are also premised on the materials allegedly taken from Mr. Sigler at one of the motel rooms. Mrs. Sigler and her daughter have asserted a possessory interest in the seized materials, contending they are entitled to the materials under Mr. Sigler's will. They allege that Mrs. Sigler's consent for defendant Schaffstall to enter the Sigler residence and take the materials was involuntarily and fraudulently obtained through the defendants' coercion of Mr. Sigler into calling Mrs. Sigler and convincing her to allow defendant Schaffstall to enter the Sigler residence and remove Mr. Sigler's papers and effects.

### A. Sovereign Immunity

Although the United States is not a defendant in this matter, the complaints in both actions seek damages against the defendants in both their official and individual capacities. The Government, through defendant Alexander, has moved to dismiss the plaintiffs' claims insofar as they seek to establish the liability of the United States for damages. The Government bases its motion on the doctrine of sovereign immunity.

■ The Supreme Court has held that an action against an officer of the United States is, in fact, a suit against the sovereign if "the judgment sought would expend itself on the public treasury or domain." *Dugan v. Rank*, 372 U.S. 609, 620, 83 S.Ct. 999, 1006, 10 L.Ed.2d 15 (1963); *Land v. Dollar*, 330 U.S. 731, 738, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947). The doctrine of sovereign immunity bars actions against the United States for monetary damages except for cases where it consents to be sued. *United States v. Sherwood*, 312 U.S. 584, 586, 61 S.Ct. 767, 85 L.Ed. 1058 (1941). The plaintiffs have cited no statute authorizing a judgment against the United States for

monetary damages in an action brought nominally against its officers. Cases sounding in tort may generally be brought against the United States only under the provisions of the FTCA; the plaintiffs have not brought such a suit. The plaintiffs essentially conceded the above at oral argument. Therefore, insofar as the plaintiffs' claims seek to establish the liability of the United States for damages, their claims are barred by the doctrine of sovereign immunity.

### B. The Unknown Defendants

■ The Government has moved to dismiss the claims against the unknown defendants who are or were members of the Army, the CIA, and the FBI in 1976. These unknown defendants are mentioned only in the captions of the complaints. Nowhere in the body of the complaints are there any descriptions of these unknown defendants or any allegations of the wrongdoing in which these parties engaged.[9] Under these circumstances, the Court fails to see what legitimate purpose is served by allowing an action for monetary damages against unknown parties to proceed. *Craig v. United States*, 413 F.2d 854, 856–57 (9th Cir.), *cert. denied*, 396 U.S. 987, 90 S.Ct. 483, 24 L.Ed.2d 451 (1969); *Reaves v. Sieloff*, 382 F.Supp. 472, 475–76 (D.Pa.1974). *Cf. Boyd v. Gullett*, 64 F.R.D. 169, 173 (D.Md.1974) (injunctive relief sought against John Doe defendants).

The plaintiffs have cited no authority to the contrary; they merely urged at oral argument that an appropriate remedy for this deficiency could be fashioned at the end of the case after the liability of all the defendants is determined. The Court sees no reason for delaying the inevitable. The complaints must be dismissed as to the unnamed members of the Army, the CIA, and the FBI.

9. This case is distinguishable from *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). In *Bivens*, the plaintiff's complaint explicitly set out the alleged wrongdoing by federal agents. This enabled the district court to order service to be made upon those federal agents shown by the records of the U.S. Attorney to have participated in the allegedly illegal raid. *Id.* at 389–90 n.2, 91 S.Ct. 1999. Such particularity in the complaint is obviously lacking here.

## C. Special Agent Prasek

Special Agent Prasek of the FBI has filed a motion to dismiss the complaint against him in Civil Action No. N–78–1237 for failure to state a claim.[10] Defendant Prasek contends that the plaintiffs have failed to allege sufficient facts against him to constitute a claim. This Court agrees.

■ The Court is aware of the Supreme Court's admonition in *Conley v. Gibson*, 355 U.S. 41, 45, 78 S.Ct. 99, 102, 2 L.Ed.2d 60 (1957) "that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Nevertheless, a complaint must "give the defendant fair notice of what the plaintiff's claim is *and the grounds upon which it rests.*" *Id.* at 48, 78 S.Ct. at 103 (emphasis added). The plaintiffs' complaint fails to comply with this mandate.

■ The plaintiffs have alleged that defendant Prasek was part of a conspiracy against the decedent to deprive him of his constitutional and state law rights. A complaint alleging a conspiracy must do more than state mere legal conclusions regarding the existence of the conspiracy. Specific factual allegations connecting the defendant to the injury are essential to state a cause of action; otherwise, the complaint is subject to dismissal. *Sparks v. Duval Country Ranch Co.*, 604 F.2d 976, 978 (5th Cir. 1979) (dictum); *Ostrer v. Aronwald*, 567 F.2d 551 (2d Cir. 1977); *Kadar Corp. v. Milbury*, 549 F.2d 230 (1st Cir. 1977); *Rotolo v. Borough of Charleroi*, 532 F.2d 920 (3d Cir. 1976); *Greene v. Johns Hopkins University*, 469 F.Supp. 187, 198 (D.Md.1979); *Wetherington v. Phillips*, 380 F.Supp. 426 (E.D.N.C.1974), *aff'd mem.*, 526 F.2d 591

(4th Cir. 1975). Judge (now Justice) Stevens perhaps summed it up best in *Cohen v. Illinois Institute of Technology*, 524 F.2d 818, 827 (7th Cir. 1975), *cert. denied*, 425 U.S. 943, 96 S.Ct. 1683, 48 L.Ed.2d 187 (1976):

We agree that plaintiff is entitled to the fullest opportunity to adduce evidence in support of her claim. But she is not entitled to a trial, or even to discovery, merely to find out whether or not there may be a factual basis for a claim which she has not made.

In regard to defendant Prasek, the plaintiffs have alleged a theory without facts.

In the plaintiffs' twenty-eight page amended complaint, there are three factual references to defendant Prasek's so-called involvement in this affair. The first reference is on page five of the complaint, in the list of parties, where it is stated that he

had responsibility for coordinating Ralph J. Sigler's intelligence activities at all times relevant herein. Defendant Prasek, along with defendants Schaffstall and Zapata, was a case officer of Ralph J. Sigler at the time of his death. The actions of Defendant Prasek described herein were taken in both his individual and official capacities. The actions regarding matters described herein were reviewed by his superiors.

The second reference is in paragraph thirteen of the amended complaint. The plaintiffs refer to a letter written by Mr. Sigler to his wife on April 10, 1976. In that letter, Mr. Sigler told his wife, "Should anything happen to me, suicide, death or accident sue the U.S. Army for being the cause." The letter specifically directed Mrs. Sigler to sue defendants LeVan, Aarons, Grimes, Jones, Schaffstall, Zapata, and Prasek.[11] The

---

**10.** The plaintiffs did not respond in writing to defendant Prasek's motion to dismiss. At oral argument, they did not cite authority to the contrary; they merely relied on the allegations as set forth in the complaint described *infra* in the text of this opinion.

**11.** Plaintiffs, in their amended complaint in Civil Action No. N–78–1237 at paragraph thirteen, allege that in this letter Mr. Sigler "described the mental and physical danger in

which he was placed." A review of the letter, part of the record in this case, shows this characterization to be an exaggeration of the letter's contents. The letter reads in full as follows:

10 April 76

Dear Ilse:

Should anything happen to me, suicide, death, or accident sue the U S Army for

third reference surfaces at paragraph twenty of the amended complaint, where the plaintiffs state, "On April 17, 1976 [four days after Mr. Sigler's demise] Defendant Schaffstall travelled to El Paso and communicated with Defendants Zapata and Prasek."

The first reference obviously does not state a claim against defendant Prasek; it merely describes his professional relationship with the decedent. The third reference also does not allege any wrongful act by defendant Prasek. It simply refers to a communication, the nature of which is completely unspecified. As Mr. Sigler's case officer, one might expect defendant Prasek to be engaged in communications with others associated with Mr. Sigler after Mr. Sigler's demise.

The only factual allegation in the entire complaint that comes close to stating a claim against defendant Prasek is the plaintiffs' reference to the letter Mr. Sigler wrote to his wife three days before he died. In essence, Mr. Sigler said that should anything happen to him Mrs. Sigler should sue defendant Prasek and other named individuals. The letter gives no reasons for this direction to Mrs. Sigler, nor does it give any facts upon which a claim could be based. To accept this letter as stating a claim would compel this Court to engage in sheer speculation. Putting aside any possible hearsay problems, the letter simply provides too flimsy a thread to link defendant Prasek to the allegedly unlawful search of the Sigler residence and seizure of Mr. Sigler's memoirs material. Facts are conspicuously

absent in the claims against defendant Prasek. Plaintiffs are not entitled to discovery merely to find out whether there may be a factual basis for a claim that they have not made. *Cohen, supra* at 827.

Although this Court will grant defendant Prasek's motion to dismiss, it believes that the plaintiffs should be given one more opportunity [12] to amend their complaint to cure the lack of specific factual allegations against defendant Prasek, if indeed this defect can be corrected. Accordingly, defendant Prasek's motion to dismiss for failure to state a claim is granted without prejudice to the plaintiffs to file a second amended complaint, in compliance with the aforementioned rules of pleading, within thirty days of the filing of this opinion.[13]

### D. The Feres Doctrine

The Army defendants seek to extend the *Feres* doctrine to bar the individual claims of Mrs. Sigler and her daughter for conversion, replevin, and constitutional injuries. The defendants' position is that the alleged injuries to Mr. Sigler and the alleged injuries to his wife and daughter are so closely interrelated that they should be considered identical and hence barred by *Feres.* Specifically, the defendants argue that the question of Mr. Sigler's voluntary consent *vel non* (upon which Mrs. Sigler's consent turns) for defendant Schaffstall to "search" the Sigler residence and take Mr. Sigler's papers and effects hinges on an examination of what transpired between Mr. Sigler and various of the Army defendants. The defendants contend that examining these

---

being the cause, naming specificaly the following as defendant.

| | |
|---|---|
| Maj. Gen. C.J. | Le Van |
| Maj Gen | Aarons |
| Col. | Grimes |
| Maj. | Noel Jones |
| CW 4 | John Schaffstall |
| CW 4 | Carlos Zapata |
| Special Agent | Francis Pracek (FBI) |

in addition request all papers picked up by John Schaffstall on 9 April 76 be returned to you immediately.

Love,
Ralph
OVER

P.S. get a reputable lawyer. Your boss should be able to recommend a good one.
R.

PPS If nothing happens and I return give this back to me.
R.

**12.** The Court notes that it has already permitted the plaintiffs to file a first amended complaint on April 2, 1979.

**13.** Because of the Court's disposition of defendant Prasek's motion to dismiss, it need not address his other grounds for the motion. Defendant Prasek is, of course, free to raise these grounds at a later time, if deemed appropriate.

matters and questioning decisions made in the military chain of command is what the *Feres* case was designed to prevent. This Court disagrees.

 As this Court stated earlier, *Feres* applies only when military personnel are injured incident to service by governmental or other military personnel. Mrs. Sigler and her daughter are civilians. The *Feres* doctrine simply does not apply when a civilian relative of a serviceman has been injured by actions of military personnel. *Hall v. United States*, 314 F.Supp. 1135, 1136 n. 2 (N.D.Cal.1970); *Grigalauskas v. United States*, 103 F.Supp. 543, 548–50 (D.Mass.1951), aff'd 195 F.2d 494 (1st Cir. 1952); *Herring v. United States*, 98 F.Supp. 69 (D.Colo.1951) (medical malpractice cases). It would be manifestly unjust to allow the military to use the *Feres* doctrine to shield itself from liability when it injures a civilian. Civilian relatives of military personnel are not stripped of their constitutional and state law rights merely because of their relationships with servicemen.

Moreover, the fact that discharged military personnel are not barred by *Feres* from recovering damages against the military for post-discharge injuries, *United States v. Brown*, 348 U.S. 110, 75 S.Ct. 141, 99 L.Ed. 139 (1954); *Thornwell v. United States*, 471 F.Supp. 344, 349–53 (D.D.C. 1979), demonstrates that *Feres* is limited to actions for injuries to active duty servicemen sustained incident to service. Even though such post-discharge suits inevitably involve the examination of military matters and the questioning of decisions made in the chain of command, this does not invoke the *Feres* doctrine. *See also Dilley v. Alexander*, 195 U.S.App.D.C. 332, 337–38, 603 F.2d 914, 919–20 (D.C.Cir. 1979); Note, *From* Feres *to* Stencel: *Should Military Personnel Have Access to FTCA Recovery?*, 77 Mich.L.Rev. 1099, 1109–18 (1979). While the alleged injuries to Mrs. Sigler and her daughter arose out of the same factual scenario as the alleged injuries to Mr. Sigler, their injuries are distinct. *Feres* does not apply to their claims.

### E. The State Secrets Privilege

The defendants strenuously argue that the claims of Mrs. Sigler and her daughter are precluded from consideration "because their litigation cannot proceed without inquiry into areas sheltered by the Government's assertion of the state secrets privilege." *Supplemental Memorandum In Support Of Motions To Dismis Of Defendants Aaron, Grimes, Jones, Martel, Schaffstall, Drake, Conway, And King* at 8. Grounds for this argument are essentially twofold. First, defendants submit that the question of Mr. Sigler's consent to allow the defendants to retrieve his memoirs material cannot be resolved without revealing the contents of the classified material. Secondly, defendants assert that the question of Mr. Sigler's consent would inevitably expose details of Mr. Sigler's relationship with the defendant intelligence officers. This relationship defendants contend, involves classified information and is protected by the state secrets privilege.

In *Totten v. United States*, 92 U.S. 105, 23 L.Ed. 605 (1875), the Supreme Court affirmed the dismissal of an action on the ground that the suit could not be litigated without revealing governmental secrets. *Totten* involved a suit for breach of a contract between the plaintiff and President Abraham Lincoln under which the plaintiff contracted to engage in intelligence gathering operations against the Confederacy during the Civil War. The Court held that public policy forbade the maintenance of plaintiff's suit:

The secrecy which such contracts impose precludes any action for their enforcement. The publicity produced by an action would itself be a breach of a contract of that kind, and thus defeat a recovery. It may be stated, as a general principle, that public policy forbids the maintenance of any suit in a court of justice, the trial of which *would inevitably lead to the disclosure of matters which the law regards as confidential*, and respecting which it will not allow the confidence to be violated. On this principle, suits cannot be maintained which would require a

disclosure of the confidences of the confessional, or those between husband and wife, or of communication by a client to his counsel for professional advice, or of a patient to his physician for a similar purpose. Much greater reason exists for the application of the principle to cases of contract for secret services with the Government, as the existence of a contract of that kind is itself a fact not to be disclosed.

*Id. at 107* (emphasis added). *Accord, Halkin v. Helms,* 194 U.S.App.D.C. 82, 598 F.2d 1 (D.C.Cir. 1978); *Tucker v. U. S.,* 118 F.Supp. 371, 127 Ct.Cl. 477 (1954) (per curiam); *Farnsworth Cannon, Inc. v. Grimes,* No. 79–16–A (E.D.Va. March 2, 1979), *appeal docketed,* No. 79–1260 (4th Cir. May 1, 1979). Commenting on the *Totten* case in *United States v. Reynolds,* 345 U.S. 1, 11 n. 26, 73 S.Ct. 528, 533–534 n. 26, 97 L.Ed. 727 (1953), the Supreme Court noted that "[t]he action was dismissed on the pleadings without ever reaching the question of evidence, since it was so obvious that the action should never prevail over the privilege."

At this stage of the proceedings, the Court is not convinced that litigation of the claims of Mrs. Sigler and her daughter would "inevitably" lead to disclosure of the *contents* of the secret materials. *Cf. Jabara v. Kelley,* 476 F.Supp. 561, 578 (E.D. Mich.1979) ("[R]esort need not be made to privileged material to establish a violation of the plaintiff's constitutional rights."). The Government and the defendants have merely given conclusions on this point rather than explanations. It seems to this Court that if the parties stipulate that the classified materials are top secret and should not be divulged, then their contents need not be revealed prior to, or at trial.[14] The Court fails to see how any of the defendants' possible good faith defenses would be eliminated. To rely on these defenses, the defendants would only have to establish the classified *nature* of the materials (which could be stipulated); there would be no need to reveal their *contents.* In so

ruling, this Court does not foreclose the possibility that at some subsequent point in these proceedings it might become obvious that further litigation of the plaintiffs' claims would inevitably lead to disclosure of the contents of the secret materials. If such an event occurs, the Court will entertain an appropriate motion from counsel for the defendants.

Defendants' second ground, that the question of Mr. Sigler's consent would inevitably expose Mr. Sigler's relationship and communications with the defendant intelligence officers, presents a much closer question. The defendants claim that Mr. Sigler's relationship with the defendant intelligence officers involves classified information and is protected by the state secrets privilege. This Court believes that the question of Mr. Sigler's consent will likely mandate the exposure of his relationship and contacts with the defendant intelligence officers, in particular the ones who allegedly interrogated him and procured his "consent." These matters might well be protected by the state secrets privilege as it is probable that intelligence activities are involved.

■ The Government, however, has not made a formal claim of the state secrets privilege insofar as Mr. Sigler's contracts with the defendant intelligence officers are concerned. The formal claim of the state secrets privilege by Secretary Alexander relates only to the classified materials seized by the defendants; it does not extend to Mr. Sigler's professional contacts. The state secrets privilege must be invoked by the head of the department or agency responsible for the defendant intelligence officers after actual personal consideration of the matter by that individual. *United States v. Reynolds,* 345 U.S. 1, 7–8, 73 S.Ct. 528, 97 L.Ed. 727 (1953); *Kinoy v. Mitchell,* 67 F.R.D. 1, 8–10 (S.D.N.Y.1975). Should the Government assert a formal claim of privilege over Mr. Sigler's relationship and

---

14. At the hearing on the motions to dismiss, plaintiffs' counsel indicated their willingness to so stipulate.

contacts with the defendant intelligence officers during the period in which he allegedly consented to the search of his residence, this Court requests that the Government ensure "that the Court possesses the requisite supporting material to enable it to make an informed judgment upon the merits of the claim of privilege." *Kinoy, supra* at 10. The Government has thirty days to submit a formal claim of the state secrets privilege over this matter to this Court, along with the requisite supporting material.

### F. Other Defenses

The defendants have raised myraid other defenses to the claims asserted by Mrs. Sigler and her daughter. The plaintiffs' claims depend on the validity *vel non* of Mr. Sigler's consent. If the state secrets privilege forecloses investigation into the voluntariness of Mr. Sigler's consent, then the plaintiffs' state law and constitutional claims are barred.[15] This Court will therefore defer ruling on these other defenses until the Government has had an opportunity to assert a further claim of the state secrets privilege.

### SUPPLEMENTAL OPINION

On January 7, 1980, this Court filed an opinion (hereinafter *Court's Opinion*) in which it dismissed plaintiffs' claims for damages for injuries to Ralph J. Sigler and plaintiffs' claims for injunctive relief. This Court also dismissed the plaintiffs' personal claims of conversion, replevin, and violations of their fourth and fifth amendment rights against defendant Prasek, the unknown defendants, and against the United States. In that opinion, however, the Court rejected defendants' motions to dismiss plaintiffs' personal claims on the basis of the *Feres* doctrine.

The litigation of plaintiffs' personal claims hinges on the question of whether

Mr. Sigler consented to turning over his memoirs material to the defendant. In its opinion, the Court noted that "the question of Mr. Sigler's consent will likely mandate the exposure of his relationship and contacts with the defendant intelligence officers, in particular the ones who allegedly interrogated him and procured his 'consent.'" *Court's Opinion* at 29. Since this involves matters that might be protected by the state secrets privilege, this Court gave the Government thirty days in which to prepare a formal claim of the state secrets privilege over the matter of Mr. Sigler's relationship and contacts with these defendants. On February 8, 1980, the Government filed a motion for extension of time to February 15, 1980 to respond to the Court's directive, which this Court granted. On February 25, 1980, the Government filed a memorandum in which it stated that it declined to raise the state secrets privilege at this time. This Court will, therefore, now address the other defenses raised by the defendants in their motions to dismiss.

 Plaintiffs' remaining claims against Secretary Alexander, in his individual capacity, must be dismissed for failure to state a claim. It is undisputed that defendant Alexander did not become Secretary of the Army until February 14, 1977, almost ten months after the events that form the basis for the complaint against him in Civil Action No. N–78–1237. There are no allegations of any wrongdoing on his part. This remaining portion of the case against Secretary Alexander will therefore be dismissed. As with the dismissal of the claims against defendant Prasek, *see Court's Opinion* at 24, this dismissal is without prejudice to the plaintiffs to file a second amended complaint in Civil Action No. N–78–1237 within thirty days of the filing of this opinion.

 Plaintiffs' remaining claims against defendant LeVan in Civil Action No. N–78–1237 must also be dismissed for failure to state a claim. References to defendant Le-

---

15. The alleged acts of coercion took place at one of the Fort Meade motel rooms by certain of the defendant Army intelligence officers. If inquiry into this coercion is foreclosed, the claims against the other defendants who were

not present at the time of the alleged coercion must be dismissed since the events that transpired in the motel room are crucial to the plaintiffs' claims.

Van's alleged involvement in this case appear only twice in the amended complaint. On page four of the amended complaint, plaintiffs state the following:

MAJOR GENERAL C. J. LE VAN, United States Army, was the commanding general of Fort Bliss, Texas between June, 1973 and June, 1976, with administrative control and responsibility for Ralph J. Sigler. Defendant LE VAN was informed of Ralph J. Sigler's work for USAINTA, and was notified of certain of Sigler's specific intelligence activities. The actions of Defendant Le Van described herein were taken in both his individual and official capacities.

This statement contains no allegations of wrongdoing by defendant LeVan and is plainly insufficient to support the claims against him. *See* the cases cited in *Court's Opinion* at 21–22.

The only other reference to defendant LeVan's alleged involvement is contained in paragraph thirteen of the amended complaint where the plaintiffs refer to a letter written by Mr. Sigler to his wife on April 10, 1976. The Court found this letter insufficient to state a claim against defendant Prasek, *see Court's Opinion* at 22–24, and the Court likewise finds the letter insufficient to state a claim against defendant LeVan. As with the dismissal of the claims against defendant Prasek, *see Court's Opinion* at 24, this dismissal is without prejudice to the plaintiffs to file a second amended complaint in Civil Action No. N–78–1237 within thirty days of the filing of this opinion.

Plaintiffs' remaining claims against defendant Aaron in these consolidated cases must also be dismissed for failure to state a claim. The first reference to him in Civil Action No. N–78–1237 is in the identification of parties section, which does not state a claim against him. The second reference to defendant Aaron is in paragraph thirteen of the amended complaint, which refers to the aforementioned April 10, 1976 letter from Mr. Sigler to his wife. For the same reasons, this Court finds the letter insufficient to state a claim against defendant Aaron. Similar references to defendant Aaron in Civil Action No. N–79–918 are likewise insufficient to state a claim against him. This Court will therefore dismiss plaintiffs' remaining claims against defendant Aaron in these consolidated cases, without prejudice to the plaintiffs to file amended complaints in Civil Actions Nos. N–78–1237 & N–79–918 within thirty days of the filing of this opinion.

Plaintiffs' remaining claims against defendant Zapata in these consolidated cases must also be dismissed for failure to state a claim. There are three references to his alleged involvement in this case in the amended complaint in Civil Action No. N–78–1237. The first references are on pages eight and ten, where it is alleged that defendant Zapata made telephone arrangements for Mr. Sigler's release from Fort Bliss, Texas. This statement contains no allegation of wrongdoing. The second reference is to the aforementioned April 10, 1976 letter, which this Court has already found insufficient to state a claim against the other defendants. The third reference is on page fifteen of the amended complaint where the following is alleged:

Pursuant to communications between themselves, Defendants Martel, Jones, Grimes and Drake met at Sigler's room at the Holiday Inn and collectively conducted an illegal and unreasonable search in violation of the fourth amendment. After completion of this illegal and unreasonable search of the motel room and seizure of papers and effects, Defendant Jones communicated with Defendants Schaffstall and Zapata. On April 17, 1976 Defendant Schaffstall travelled to El Paso and communicated with Defendants Zapata and Prasek.

The nature of these communications is completely unspecified, and this reference does not allege any wrongful act by the defendant. Similar references to defendant Zapata in Civil Action No. N–79–918 are likewise insufficient to state a claim against him. This Court will therefore dismiss plaintiffs' remaining claims against defendant Zapata in these consolidated cases, without prejudice to the plaintiffs to file amended complaints in Civil Actions Nos. N–78–1237 & N–79–918 within thirty days of the filing of this opinion.

■ The Court finds that the plaintiffs' actions against the remaining defendants for conversion, replevin, and fourth and fifth amendment violations, in regard to the alleged seizure or taking of the classified materials, must also be dismissed.[1] It is beyond dispute that the plaintiffs have no greater right to maintain an action for the taking of Mr. Sigler's "possessions" than would Mr. Sigler, were he alive today. ·The Court believes that the Government has shown that Mr. Sigler had no right to possess the classified materials in question and that his retention of them at his residence was unauthorized. *See Defendant Clifford Alexander's Points And Authorities In Response To Questions By The Court* at 4–16; 32 C.F.R. § 159.501(b) (1976). *See also Snepp v. United States,* —— U.S. ——, 100 S.Ct. 763, 62 L.Ed.2d 704 (1980) (per curiam). Mr. Sigler could not, therefore, assert an action for the deprivation of the classified materials were he alive today. *See* 18 U.S.C. §§ 792 *et seq.*; W. Prosser, Torts § 13, at 94 (4th ed. 1971). *A fortiori,* the plaintiffs may not maintain such an action. Moreover, since Mr. Sigler had no right to transfer classified materials to his heirs, the plaintiffs could not have any expectation of inheriting, or property interest in, the classified materials, and thus cannot have standing to sue in their own right.

■ Consequently, the plaintiffs are now left only with their personal claims in regard to the non-classified materials. There is no question that Mr. Sigler owned these materials. The Court believes that plaintiffs' mere expectancy interests, as heirs of Mr. Sigler, in the non-classified materials are not sufficiently concrete to give them the right to maintain these actions for the seizure or taking of the materials. *See Board of Regents v. Roth,* 408 U.S. 574, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972); T. Cooley, Constitutional Limitations at 750 (8th ed. 1927); 18 Am.Jur.2d *Conversion* § 54, at 192 (1965). Plaintiffs have cited no authority to the contrary.[2]

Although the plaintiffs possessed expectancy interests in the non-classified materials at the time of their seizure, no right to a cause of action had vested in them. That right was vested in Mr. Sigler, who could have cut off their expectancy interests by grant or devise. Plaintiffs cannot now maintain an action for a wrongful seizure that took place when title to the non-classified materials was vested in Mr. Sigler.

This finding does not end the Court's inquiry, however. In several portions of the complaints, plaintiffs have alleged a *continuing* deprivation of the non-classified materials. Assuming, as this Court must for the purposes of a motion to dismiss, that title to the non-classified materials vested in the plaintiffs after Mr. Sigler's will was probated, then plaintiffs presumably have a cause of action for any continued "deprivation" of the non-classified materials after title vested in them.[3]

The plaintiffs' remaining claim is under the fourth amendment for the allegedly unreasonable search of the Sigler residence.[4] While this claim may be barred by the state secrets privilege or blocked by a good faith immunity defense, these questions cannot be resolved in the present posture of the case.

In his motion to dismiss, filed July 6, 1979, defendant Drake made the bare assertion that he had not yet been served with process in Civil Action No. N–78–1237. *Court Paper No. 121* is the "U.S. Marshals

---

1. See note 4 *infra.*

2. In *Plaintiffs' Supplemental Memorandum Of Law In Opposition To Defendants' Motion To Dismiss* at 7, plaintiffs allege that they were in actual possession of the materials at the time of their alleged seizure. Plaintiffs have not pointed to any such allegations in either of their complaints.

3. The Court notes that the non-classified materials taken from the Sigler residence were re-

turned to plaintiffs' counsel, after a formal demand. This action renders the question of damages a highly speculative issue, particularly if the non-classified materials were mistakenly confused with the classified materials.

4. The Court recognizes that the plaintiffs have a cause of action for the alleged search of the Sigler residence for the classified and non-classified materials.

Service Process Receipt and Return" which indicates that a Deputy U.S. Marshal served Bessi Drake, the defendant's mother, at Mr. Drake's residence on June 27, 1979. The issue was not raised at the hearing on the motions to dismiss, so the Court believes the issue to be moot. Defendant Drake's motion to dismiss for lack of personal jurisdiction is therefore denied.